IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM BRANCH                    :        CIVIL ACTION

    V.                    :        NO. CV-00-1728

NEIL HEFFERMAN, P.A., et al.        :

FILED
SCRANTON

AUG 2 8 2001

PER _____ DEPUTY CLERK

EXHIBITS OF NEIL HEFFERMAN, P.A. IN SUPPORT OF HIS MOTION
TO DISMISS THE COMPLAINT OF WILLIAM BRANCH



AO 440 (Rev. 10/93) Summons in a Civil Case

# United States District Court
### MIDDLE DISTRICT OF PENNSYLVANIA

## SUMMONS IN A CIVIL CASE

William R. Branch, Plaintiff

CASE NUMBER: 1:CV-00-1728

Judge Rambo

**v.**

CO Russian; Mr. Friedman; Cpt. Griffin; Mrs. Martin;
Ms. Surace; Mr. Gorman; Lt. Welling; PA
Hefferman; Mr. Richards; Mr. Jones; Cpt. Gavin; Mr.
Burke; Pastor Gagas; Mr. Scalzo; Mr. Horn; Ms.
Wilbur; Mr. Walsh; CO Karwowski; Ms. Suchy; and
JOHN DOES, individual and official capacity,
Defendants

To: (For the name and address of defendant(s): **SEE COMPLAINT**)

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY
William R. Branch, CF-3756, SCI-WAYMART, P.O. Box 256, Route 6, Waymart, PA 18472-
0256

an answer to the complaint which is herewith served upon you, within 20 days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default
will be taken against you for the relief demanded in the complaint. You must also file your
answer with the Clerk of this Court within a reasonable period of time after service.

MARY E. D'ANDREA, Clerk          DATE: July 31, 2001

**(By) Ann Severino-Michael, Deputy Clerk**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM R. BRANCH,
        Plaintiff       :     CIVIL NO. 1:CV-00-1728
                           :
      v.               :     (Judge Rambo)
                           :
MR. RUSSIAN, <u>et. al.</u>,
        Defendants   :

FILED
HARRISBURG, PA

JUL 3 1 2001

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## O R D E R

AND NOW, THIS 31st DAY OF JULY, 2001, **IT IS HEREBY ORDERED**
THAT:

      1. This court's previous order (Doc. 20) dated July 10, 2001 is vacated in part as to the order dismissing the complaint and closing the case.[1]

      2. The Clerk of Court shall reopen the file.

      3. Plaintiff's motion to proceed <u>in</u> <u>forma</u> <u>pauperis</u> is construed as a motion to proceed without full prepayment of fees and costs and the motion is granted.[2]

      4. The United States Marshal is directed to serve plaintiff's amended complaint (Doc. 22) on the defendants named therein.

      5. Plaintiff's request for change of venue contained within his amended complaint is denied pursuant to Rule 7 of the Federal Rules of Civil Procedure.

                          WILLIAM W. CALDWELL
                          United States District Judge
                          on behalf of Judge Rambo

---

1. Branch was previously directed by this court to file an amended complaint. Due to clerical error, the amended complaint was initially processed as a new complaint and this court issued an order dismissing the complaint for failure to comply with court order. The amended complaint has now properly been documented.

2. Branch completed this court's form application to proceed <u>in</u> <u>forma</u> <u>pauperis</u> and authorization to have funds deducted from his prison account. The court then issued an Administrative Order directing the warden at his present place of confinement to commence deducting the full filing fee from plaintiff's prison trust fund account.

## NOTICE OF JUDICIAL ASSIGNMENT

This case has been assigned to the Judicial Officer indicated below.  Counsel and all parties are advised that there is an Office of the Clerk in the Federal Courthouses in Scranton, Harrisburg and Williamsport, Pennsylvania.  Please file all pleadings directly with the Clerk's Office in which the Judicial Officer is stationed.  Do not file any courtesy copies with the court.

In accordance with the local rules, counsel will file the original and two copies of all pleadings, motions, memoranda and other documents except discovery material, with the Clerk's Office.  Counsel should file any additional copies with the Clerk's Office as may be required by the Local Rules, an Order of Court, or as required by the assigned Judicial Officer listed below.

### JUDICIAL ASSIGNMENT

_____ Judge Thomas I. Vanaskie

_____ Judge A. Richard Caputo

_____ Judge James M. Munley

_____ Judge William J. Nealon

_____ Judge Richard P. Conaboy

_____ Judge Edwin M. Kosik

✓ Judge Sylvia H. Rambo

_____ Judge Yvette Kane

_____ Judge William W. Caldwell

_____ Judge James F. McClure

_____ Judge Malcolm Muir

### CLERK'S OFFICE ADDRESS

William J. Nealon Federal Building &
U.S. District Courthouse
235 N. Washington Avenue
P.O. Box 1148
Scranton, Pennsylvania 18501
(570) 207-5600

U.S. District Courthouse
228 Walnut Street
P.O. Box 983
Harrisburg, Pennsylvania 17108
(717) 221-3920

U.S. District Courthouse
240 W. Third Street
P.O. Box 608
Williamsport, Pennsylvania 17701
(570) 323-6380

NOTE: This case has been referred to the U.S. Magistrate Judge noted below.  Please file all documents at the location indicated.

_____ Magistrate Judge J. Andrew Smyser          Harrisburg Address

_____ Magistrate Judge   Malachy Mannion         Scranton Address

_____ Magistrate Judge Thomas M. Blewitt         Scranton Address

# FORM TO BE USED BY A PRISONER IN FILING A CIVIL RIGHTS COMPLAINT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CF-3756

**(Inmate Number)**

WILLIAM BRANCH

**(Name of Plaintiff)**
SCI-WAYMART P.O. BOX 256
WAYMART, PA 18472-0256

**(Address of Plaintiff)**

1: CV 01-1356

1- 00 - 1728

**(Case Number)**

**COMPLAINT**

FILED
SCRANTON

JUL 2 0 2001

PER _____

DEPUTY CLERK

**vs.**

CO RUSSIAN, MR FRIEDMAN, CPT GRIFFIN, MRS MARTIN, MS SURACE,

MR GORMAN, LT WELLING, PA HEFFERMAN, MR RICHARDS, MR JONES,

CPT GAVIN, MR BURKE, PASTOR GAGAS, MR SCALZO, MR HORN,
MS WILBUR, MR WALSH, CO KARWOWSKI, MS SUCHY, JOHN DOES *individual & official capacity*

**(Names of Defendants)**

TO BE FILED UNDER: __X__ 42 U.S.C. § 1983 - STATE OFFICIALS

_____ 28 U.S.C. § 1331 - FEDERAL OFFICIALS

## I.  Previous Lawsuits

**A.**  If you have filed any other lawsuits in federal court while a prisoner please list the caption and case number including year, as well as the name of the judicial officer to whom it was assigned:

BRANCH v. DOC, CIVIL ACTION NO: 1:CV-00-1728, 2000
BRANCH v. HORN, ET AL, CIVIL ACTION NO: 1:CV-99-0670, 1999,
BRANCH v. FABERICTORE

SYLVIA H. RAMBO, U.S. DISTRICT JUDGE PRESIDED OVER ALL THREE CASES.

## II.  Exhaustion of Administrative Remedies

**A.**  Is there a grievance procedure available at your institution?
__X__Yes  _____No

**B.**  Have you filed a grievance concerning the facts relating to this complaint?
__X__Yes  _____No

If your answer is no, explain why not  NON APPLICABLE

**C.**  Is the grievance process completed?  __X__Yes  _____No

III.  Defendants

(In Item A below, place the full name of the defendant in the first blank, his/her official position
the second blank, and his/her place of employment in the third blank.  Use Item B for the name
positions and places of employment of any additional defendants.)

A.    Defendant   MR. RUSSIAN _____ is employe

as CORRECTIONS OFFICER _____ at   SCI-WAYMART

B.    Additional defendants MR FRIEDMAN, CPT GRIFFIN, MR GORMAN, LT WELLING,

PA HEFFERMAN, CPT GAVIN, MR BURKE, PASTOR GAGAS, MS WILBUR, MR. WALSH,

CO JOHN DOE(S), CO KARWOWSKI, MRS MARTIN, MR RICHARDS, FORMER SECRETARY HORN,

MR SKALZO, MS SUCHY, AND HEARING EXAMINER JONES *in their official*

*capacity and individual capacity*

IV.  Statement of Claim

(State here as briefly as possible the facts of your case.  Describe how each defendant is involve
including dates and places.  Do not give any legal arguments or cite any cases or statutes.  Atta
extra sheets if necessary.)

1.    SEE ATTACHMENTS      *7 Pages*

*Retaliation for Reporting misconduct by*
*C/o Russian and Conspiracy with Mr Friedman*
*unit manager along with other Staff false charges*
*to put me in Rttu taking legal work to hinder m*

2.    SEE ATTACHMENTS     *access to court*

3.    SEE ATTACHMENTS      *7 Pages*

Page A-1

**1. ABUSE OF POWER, HARASSMENT, FALSIFYING OFFICIAL DOCUMENTS, CONSPIRACY TO INTIMIDATE IN AN ATTEMPT TO FORCE WITHDRAWAL OF PENDING LAWSUITS, VIOLATIONS OF CONSTITUTIONAL RIGHTS, TO INCLUDE, BUT NOT LIMITED TO ACCESS TO THE COURTS, DENIAL OF THE EXERCISE OF RELIGIOUS FREEDOM, AND DUE PROCESS.**

In February 2000, while employed in the Staff Dining Room, I received a write-up based upon false allegations and lies. MS. SUCHY, Kitchen Instructor, accused me of refusing to obey an order and lying to staff. She stated I ordered another prisoner to empty the garbage and return carts to main kitchen. The another prisoner made a written statement to fact the he acted on own, and that he did not take orders from other prisoners. I sent copies of the statement to Mr. Nish. I also advised the hearing officer of statements made by MS. SUCHY of her intentions to get me out of Staff Dining Room, but write-up was still upheld. This Happen as I came up For Parole

In July 2000, while housed on Block H-2, CO RUSSIAN conducted searches of my personal property, leaving it in disarray, stating he could do it per DOC Policy 203, Safety and Security Searches. However the policy permitted the checking of equipment, furniture, electrical outlets, etc, but not the search of personal property. After notifying his Supervisor, CPT GRIFFINS, of the abuses of this policy, CO RUSSIAN retaliated by increasing the frequency, and severity of his searches, while also verbally abusing me and instigating rumors about my sexual preference and of my sexual organ size.

I spoke to the psychologist, MR. GORMAN, and filed a grievance. MR. FRIEDMAN was assigned to investigate my claim, which was a conflict of interest because he is a defendant in lawsuit, and is unable to be fair and impartial with his investigation. In the midst of the physical and verbal attacks I was moved from my bottom bunk, to the top one, despite having "bottom bunk status" for medical reasons. The individual who was moved into the room and placed on the bottom bunk had a history of being argumentative and a very loud snorer. I complained of the situation, and of my belief it was done to try to provoke and/or harass me. My complaints were ignored by MR. FRIEDMAN, who threatened to penalize from the room for being a trouble maker. I voluntarily moved out of the room in an attempt to avoid any disciplinary repercussions. This Happen around April 2001

Once out of the room and into the open dormitory area CO RUSSIAN continued his searches, and verbal harassment, stating to the prisoners on both sides of me that the "fix" was in, implying other staff members were involved in his retaliatory practices. He also stated that Hearing Officer Welby was his uncle. Approximately ten days later I was placed in the RHU based on false accusations by CO RUSSIAN that I had threatened him. These actions of were part of an on-going conspiracy to coerce me into withdrawing my civil lawsuits against the Governor, the DOC, and prison staff.

While in the RHU my special diet meals were tampered with--drink lids opened or loose, bread had a heal imprint on it. Also, the caloric count for my meal was reduced from 2500 to 2000 calories, allegedly at the order of Physician's Assistant Hefferman, who denied authorizing the change. Because I am diabetic I must maintain a strict diet. However, out of fear for my safety at what might have been done to my meals, and due to food that had intentionally been tampered with, I was unable to maintain a proper diet. In addition to the food I was scared to consume, the unauthorized reduction of my required caloric intake combined to jeopardize my health, safety, and well-being.

Also, while in RHU, I was denied access to my legal work which was needed for completing pending civil and criminal actions. Without access to my legal papers I was unable to properly or timely make and file arguments, which resulted in the dismissal of pending injunctions and motions. My criminal cases were also dismissed and/or delayed because of my inability to access legal paperwork, forcing me to take appeals to the next level appellate court, delaying my appeal. I sought the assistance of another, more legally knowledgeable prisoner, which is permissible by DOC Policy, but I was denied. This denial of legal assistance further hindered and frustrated my efforts to access the courts.

After being released from the RHU I was placed on Block C-1 in a room with a prisoner who had a hole in his head, and was a smoker. I am not a smoker, and based on health reasons, I requested to be moved. However, I was forced to remain in this unfavorable situation in hopes of being beaten up or provoked by this individual so that I could be returned to RHU, and for harassment. From C-1 I was placed on D-1, which is a smoking block. Again, I made numerous requests to be moved to a non-smoking block for health reasons. Again, for two weeks my requests were ignored.

In October 2000, I was finally moved to a non-smoking block, F-2, but only after becoming sick and being ordered by medical to be moved. I was placed in a bunk next to a physically larger, and verbally aggressive Muslim prisoner, who continually verbally attacked me and my religion. He also threatened to attack me physically, while spreading rumors about me. Out of fear for my personal safety and for peace of mind, I made numerous efforts to be removed from that hostile environment, which were ignored. Finally, after approaching MRS. MARTIN with my intentions to seek legal redress, I was moved. I was not moved to one of the bunks I requested, but to a top bunk, above another prisoner with a history of violence and destruction of people's personal property.

I advised CO KARWOWSKI, who had been harassing me and provoking other prisoners to harass me, of my bottom bunk status. I let him know that because of my arthritis and tendinitis I was unable to keep climbing up and down from the top bunk, nor could I sit during count with my feet unsupported, but he did nothing. Not only had he placed me in two hostile positions, he also instructed an unknown guard to make an entry on my quarter's card for failing to sit all the way up during count; knowing that health reasons prevented me from doing so.

Again, the medical department ordered that I be moved. Again, I was placed into a hostile situation by CO KARWOWSKI. I was moved from the top bunk to a small, cramped bunk area next to a physically bigger person, who also was verbally aggressive and loud, despite availability of spacier bunk areas. The harassment received on this block was merely a continuation of the on-going attacks against me for filing lawsuits against the Governor, the DOC, and for reporting abuses of prisoners by prison staff. These actions are retaliatory in nature, and intended to force me to withdraw my pending lawsuits. The strong armed, intimidation tactics and harassment used by prison personnel are an abuse of power and violated my constitutional rights, threatened my health, and denied me access to the courts.

2. DENIAL OF EXERCISE OF RELIGIOUS FREEDOM:

[a] During ~~December~~ Sept 2000, I was ordered by CAPTAIN GAVIN to cut my hair, despite notifying prison officials that doing so would violate the exercise of my religious beliefs. On a Sunday I spoke with PASTOR GAGAS, who stated he did not have the time to discuss my haircut exemption. The next day I spoke to MR. BURKE who said I had "no win". Shortly afterward an unknown guard came to my room with a pass, ordering me to go to the barbershop to get my hair cut. I spoke with LT. PATTERSON who advised me to get my hair cut, then contest the exemption policy later.

I had been ordered by CPT GAVIN to get an haircut or go to the RHU without being afforded an opportunity to get approval of a haircut exemption. When I received written confirmation from the Universal Life Church of my "right" to be exempted from cutting my hair because I am a minister. I was still denied a haircut exemption. This denial and forced cutting of my hair were ploys by prison staff to force me to drop pending civil lawsuits through religious persecution and intimidation tactics in violation of my constitutional right to exercise religious freedom.

[B] In ~~May~~ or there about 2001, I was participating in an English Class. I sing in both the Catholic and Protestant Choirs, which practices on Wednesday evenings. The practices are at the same time as the class. I tried to get an "excused" absence for the choir practices, but was denied. MR. WALSH, the school principle, would not grant permission, stating that choir practice was voluntary. The Education Policy allows for an excused absence, once a week, for religious functions. Other prisoners are excused from class to participate in choir practice, but MS. WILBUR forced me to choose between her class or choir practice. This violates the Equal Protection Clause of the freedom to exercise religion. I was singled out for my religious beliefs, and because of the on-going harassment conspiracy against me to force me to withdraw my pending §1983 Lawsuits.

I also want to point out that Capt. Gavin and C/O Helby have over the years been instrumental in a few actions against me which are questionable 2 instences of write up and legal papers being sent out and taken after I asked that they not be sent out.

### 3. VIOLATION OF DUE PROCESS:

While employed in the Garment Plant I requested time off to prepare legal briefs for Civil Action Number 95-CV-00751. The request was approved by my counselor and unit manager. When I told MS. SURACE, she agreed. But, after the brief was completed my brief and tried to return to work, I was placed on lay-in, and not allowed to work for five days. Then, MS. SURACE wrote me up on false charges to have me placed in the RHU in an attempt to force me to withdraw my civil suit against a staff member. Another staff, CO HELBING witnessed her acts. This was done in retaliation to harass me for exercising my constitutional right to access the courts.

*Cpt Gavin approved this write* 

During the period I was being harassed by CO RUSSIAN I made SUPERINTENDENT COLLERAN aware of the continued attacks. MR. COLLERAN assigned MR. FRIEDMAN to investigate my grievance, knowing that it was a conflict of interest because MR. FRIEDMAN was a defendant in a pending lawsuit, and could not render a fair and impartial ruling. I advised HEARING OFFICER JONES that CO RUSSIANS' write-up was in retaliation for grieving him, and of MR. FRIEDMAN conflict of interest. I also advised MR. GORMAN, CPT GRIFFIN, THE PRC, and SUPERINTENDENT COLLERAN of these facts. But no written statements or acknowledgement were ever made on the record, or were any actions taken on my behalf, denying me due process and fair and impartial adjudication of my claims.

While in the RHU I was denied access to legal papers, which hindered and frustrated my access to the courts, resulting in the dismissal and delaying of my attempts to obtain legal redress for mistreatment received. I was also denied right to receive assistance from another prisoner, more qualified in law, which led to improper filing of motions, pleadings, and answers to wrong court, hindering and frustrating my efforts to access courts.

Also, while in the RHU, I was denied request slips, envelopes, paper, and other needed material to petition the courts and prison officials in order to exhaust administrative remedies. I tried to contact SUPERINTENDENT COLLERAN concerning the situation. LT WELLING came to my cell with my request to MR. COLLERAN, balled it up, and threw it into my cell. He told me not to try to report him or his staff, threatening retaliation if I persisted in trying to communicate with SUPERINTENDENT COLERAN.

As the Secretary of the DOC, MR. HORN, is directly responsible for the actions of all those under him, and ultimately responsible for the conspiratorial acts of harassment that hindered and frustrated my efforts to access the courts and violated my constitutional rights. *as he also is a defendant in my civil suit now stayed in the Third Circuit appeals court*

V. RELIEF:

From at least February 2000 to the present I have been constantly harassed and retaliated against by officials who have abused their power in a concerted effort to deny me access to the courts, and to intimidate me into withdrawing lawsuits against the Governor, Secretary Horn, The DOC, and other prison and state officials. I have endured religious persecution, been placed in the RHU, and suffered mental and verbal harassment. Based on these numerous harassing and retaliatory acts which denied me access to the courts and the freedom to exercise my religious convictions. I pray for the following relief from this Honorable Court:

[1] $200,000 in compensatory damages, and $100,000 in punitive damages.

[2] I want my current Quarter's Card, which contains numerous falsified and exaggerated entries to be destroyed.

[3] I want sanctions, such as suspensions, reprimands, and other disciplinary actions taken against the DOC employees who abused and/or ignored their duties, and an apology from CO RUSSIAN, whom I want barred from positions, such as block officer, that gives him direct authority over prisoners. And for all responsible parties to be held accountable, both individually and officially, for their actions.

I want officials at SCI-Waymart to stop threatening and harassing prisoners for exercising their right to access courts.

I would also pray that this Honorable Court will grant me a change of venue. I believe that because of the extensive interaction between myself and Judge Rambo that she can not be impartial in this matter.

**V.    Relief**

(State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no
cases or statutes.)

1.    SEE ATTACHMENTS    7- Pages

_I ask for a Change of venue as judge
Rambo because of interaction between myself
and her may not be impartial in this case_

2.

3.

Signed this ___21 st___ day of ___MAY  2001___, 19___.

_William Branch_  CF 3756
(Signature of Plaintiff)

_I declare under Penalty of law that I have no money_  _in forma pauperis_

I declare under penalty of perjury that the foregoing is true and correct.  _informas papas_

_____          _William Branch_
(Date)        MAY 21, 2001          (Signature of Plaintiff)



| | |
|---|---|
| **POLICY STATEMENT** | |
| **Commonwealth of Pennsylvania • Department of Corrections** | |

| Policy Subject: | Policy Number: |
|---|---|
| **Consolidated Inmate Grievance Review System** | **DC-ADM 804** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| July 20, 1994 | Joseph D. Lehman, Commissioner | Oct. 20, 1994 |

## I. AUTHORITY

The Authority of the Commissioner of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. PURPOSE

It is the purpose of this Administrative Directive to establish policy regarding the Consolidated Inmate Grievance Review System and to ensure that inmates have an avenue through which resolution of specific problems can be sought.

This directive sets forth procedures for the review of Inmate Grievances not already covered by other Administrative Directives and policies. It also provides the method through which review procedures established by other directives are to be integrated with the procedures outlined in this directive.

## III. APPLICABILITY

This policy is applicable to all employees of the Department of Corrections and all inmates under the jurisdiction of the Department of Corrections and to those individuals and groups who have business with or use the resources of the Department of Corrections.

## IV. DEFINITIONS

A. Grievance -

The formal written expression of a complaint submitted by an inmate related to a problem encountered during the course of his/her confinement.

B. Grievance Coordinator -

The Corrections Superintendent's Assistant in an institution or the Assistant to the Regional Director in Community Corrections who is responsible for the overall administration of the Inmate Grievance System in that facility\region. This includes all data collection, tracking and statistical reporting. At the direction of the Facility Manager or Community Corrections Regional Director, the Grievance Coordinator may be called upon to provide Initial Review of certain grievances.

DC-ADM 804

C. Grievance Officer -

An appropriate Department Head or Management Level staff person designated by the Facility Manager or CC Regional Director to provide Initial Review of an inmate grievance arising from his/her specific area of responsibility, e.g., a Unit Manager would be assigned to provide Initial Review of a grievance from the housing unit. If the grievance arises from the Food Services Area, the Grievance Officer designated by the Facility Manager shall be the Food Services Manager, likewise, the Corrections Health Care Administrator would be the Grievance Officer for a grievance related to a Health Care issue.

D. Central Office Review Committee (CORC) -

A committee of at least three (3) Central Office staff appointed by the Commissioner of Corrections to include the Commissioner, Executive Deputy Commissioner and Chief Counsel or their designees.

With the exception of appeals from disciplinary action under DC-ADM 801 and appeals arising from Health Care or medical treatment grievances, the CORC Shall have responsibility for direct review of all Inmate Appeals for Final Review.

E. Central Office Medical Review Committee (COMRC) -

A committee appointed by the Commissioner to include the Director of the Bureau of Health Services and relevant Bureau staff. The COMRC shall have responsibility for direct review of grievance appeals related to Health Care and medical treatment issues.

F. Initial Review -

The first step in the formal Inmate Grievance Process for all issues except those already governed by other specified procedures (see VI E). All reviews conducted below the level of Facility Manager or Regional Director are considered initial reviews.

G. Appeal from Initial Review -

The first level of appeal of a decision rendered at Initial Review. This appeal is directed to the Facility Manager or Community Corrections Regional Director.

**An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.**

**Only issues raised at Initial Review shall be appealed.**

H. Final Review -

Upon completion of Initial Review and appeal from Initial Review, an inmate may seek Final Review from the Central Office Review Committee (CORC), for any issue involving continued non-compliance with Department of Corrections directives or policy, the ICU Consent Decree or other law.

## V.  POLICY

A. It is the policy of the Pennsylvania Department of Corrections that every individual committed to its custody shall have access to a formal procedure - the Consolidated Inmate Grievance Review System - through which the resolution of problems or other issues of concern arising

DC-ADM 804

B. Informal Resolution of Problems - All inmates are expected to attempt to resolve problems or differences with staff on an informal basis through direct contact or by sending a request slip to appropriate staff. Action taken by the inmate to resolve the situation must be indicated on the grievance form, Section B.

The Grievance Form, DC 804, Part I, is available in each Housing Unit or upon request from Unit staff. This is the proper form to be used for submission of a grievance and it should be completed according to the directions provided.

**It is required that a genuine effort be made to resolve the problem before the grievance system is used. The inmate must document these efforts in Section B of the Grievance Form. Failure to do so may result in the grievance being returned to the inmate without action. The inmate may then refile the grievance with Section B properly completed.**

C. Any inmate using the grievance system shall do so in good faith and for good cause.

No one shall be punished, retaliated against or otherwise harmed for good faith use of this grievance system.

Deliberate misuse of the grievance system may result in restricted access or disciplinary action, at the discretion of the Facility Manager.

D. It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review. See VI., C. 1.

E. The Inmate Grievance Review System is intended to deal with a wide range of issues, procedures or events which may be of concern to inmates. It is not meant to address incidents of an urgent or emergency nature. When faced with such an event, the inmate should contact the nearest staff member for immediate assistance.

## VI. PROCEDURES

A. A Grievance shall be submitted to the Grievance Coordinator in the following manner.

1. All grievances shall be in writing and in the format provided on the forms supplied by the institution (DC-804 Part 1). See Section V., B.

2. All grievances shall be presented individually. Any grievance submitted by a group of inmates will not be processed, however, if the Grievance Coordinator believes that the issue being grieved is legitimate, it will be referred to appropriate Management Staff for review.

3. Only an inmate who has been personally affected by a Department or institution action or policy shall be permitted to seek review of a grievance or appeal. The inmate grievant must sign the grievance or appeal.

4. All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text of the grievance must be legible and presented in a courteous manner. The inmate should identify any persons who may have information which could be helpful in resolving the grievance. The inmate may also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, the ICU Consent Decree or other law. The inmate may request to be personally interviewed prior to the decision on Initial Review. Any inmate who submits a grievance containing false and malicious information may be subject to

DC-ADM 804

5. Grievances and appeals based on different events should be presented separately, unless it is necessary to combine the issues to support the claim. The Grievance Officer may combine multiple grievances which relate to the same subject.

   NOTE: At any point in the grievance process, the inmate has the right to withdraw the grievance.

B. Initial Review

1. Initial Review Procedures must be completed before Appeal from Initial Review or Final Appeal may be sought. Any claims of violation of the ICU Consent Decree must be raised through this grievance procedure before they may be addressed by any court.

2. Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause.

3. The Grievance Coordinator will forward the grievance to the appropriate Grievance Officer for investigation and resolution. The inmate grievant and other persons having personal knowledge of the subject matter may be interviewed. A grievant who has requested a personal interview, shall be interviewed.

4. Within ten (10) working days of receipt of the grievance by the Grievance Officer, the grievant shall be provided a written response to the grievance to include a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the issues raised in the grievance.

   The Grievance Coordinator may authorize an extension of up to an additional ten (10) working days if the investigation of the grievance is pending. If an extension is necessary, the grievant shall be so advised in writing.

C. Appeal from Initial Review

1. An Initial Review Decision of a grievance on a Health Care or medical treatment issue may be appealed directly to the Central Office Medical Review Committee for Final Review within five (5) days of receipt by the inmate of the Initial Review decision. A grievance for which the Corrections Health Care Administrator conducted the Initial Review will usually be considered a Medical Grievance.

   All other appeals will be submitted as follows.

2. An inmate may appeal an initial review decision to the Facility Manager or Community Corrections Regional Director in writing, within five (5) days from the date of receipt by the inmate of the Initial Review decision. **The inmate must appeal in this manner prior to seeking Final Review. Only issues which were raised for initial review may be appealed.**

3. All appeals must conform to the requirements specified in Section VI A of this directive. The appeal must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any initial review decision will be permitted.

4. The Facility Manager or Regional Director must notify the inmate of his/her decision within ten (10) working days after receiving the appeal. This decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision.

DC-ADM 804

### D. Final Review

1. Any inmate who is dissatisfied with the disposition of an Appeal from Initial Review decision, may, within seven (7) days of receiving the decision, appeal any issue related to non-compliance with the ICU Consent Decree, other law, Department directive or policy, for final review. Only issues raised at the Initial Review and Appeal level may be referred for Final Review.

2. Final Review will not be permitted until the inmate has complied with all procedures established for Initial Review and Appeal from Initial Review. Exceptions may be made for good cause.

3. Final Review of all appeals will be sent directly to the CORC except the following:

   a. Medical Grievances which will be reviewed by COMRC.

   b. Requests for Final Review of appeals from disciplinary actions which were processed through DC-ADM 801. These will be reviewed by the Office of the Chief Counsel which may respond directly to the inmate or refer the appeal to the Central Office Review Committee (CORC) for further reviews.

The address of the **CORC/COMRC** is:

> **PA DEPARTMENT OF CORRECTIONS**
> **CENTRAL OFFICE REVIEW COMMITTEE**
> **PO BOX 598/2520 LISBURN ROAD**
> **CAMP HILL, PA 17001-0598**

4. Requests for Final Review must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any second level (Appeal from Initial Review) decision will be permitted.

5. The CORC\COMRC, or any member thereof, may require additional investigation to be made prior to a decision on a Final Review appeal.

6. The CORC\COMRC will review all issues properly raised according to the above procedures. It may also review and consider any other related matter.

7. For all Appeals receiving Final Review, the CORC/COMRC will issue its decision within twenty-one (21) days after receipt of an appeal. The decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision. The committee shall notify the grievant and Facility Manager/Regional Director of its decision and rationale.

8. The Chief Counsel will notify counsel for the ICU class of disposition by the CORC/COMRC of any matter raised on Final Review alleging a violation of the ICU Consent Decree.

### E. Exceptions

Initial Review and Appeal from Initial Review of issues related to the following Administrative Directives shall be in accordance with procedures outlined therein, and will not be reviewed by the Grievance Officer or Grievance Coordinator.

1. DC ADM 805 - Policy & Procedures for Obtaining Pre-Release Transfer.

2. DC ADM 801 - Inmate Disciplinary and Restricted Housing Unit Procedures. See DC-ADM 801 VI., G & I

DC-ADM 804

4.  DC-ADM 814 - Incoming Publications

See 814-IIIB. Appeal from Initial Review, see 814-IIID.

Additionally, there may be other kinds of issues for which Initial Review Procedures have been previously established by Administrative Memorandum or Policy Statement.

F.  Admissions and Review

1.  All proceedings pursuant to this directive are in the nature of settlement negotiations and will, therefore, be inadmissible before any court or other tribunal in support of any claim made against the Commonwealth or any employee. No resolution of any grievance offered as a result of this procedure shall be admissible before any court or other tribunal as an admission of violation of the ICU Consent Decree or any State or federal law.

2.  No decision rendered as a result of the processing of a grievance shall be reviewable by any court unless it establishes a system or institution-wide violation of the decree.

G.  Completion of Review After Transfer

Any inmate who is transferred after the filing of a grievance or appeal, but prior to the completion of the appeal process, may continue to pursue the grievance or appeal by notifying the Facility Manager or Regional Director of the facility in which confined when the grievance was filed. Adjustments in the various time limitations may be made to facilitate review.

## VII.  SUSPENSION DURING EMERGENCY

In an emergency situation or extended disruption of normal institutional operation, any provision or section of this policy may be suspended by the Commissioner or his/her designee for a specific period of time.

## VIII.  RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose of the policies of the Department of Corrections.

## IX.  SUPERSEDED POLICY AND CROSS-REFERENCE

This directive revises the Inmate Grievance System (DC-ADM 804, MAY 1, 1984), and supersedes the pilot grievance system in effect at selected DOC institutions. It does not supersede or repeal any portion of any other directive or policy statement. Where this directive is inconsistent with any other directive or policy, both shall be interpreted so as to provide full review of all issues raised, consistent with the scope and purpose of this directive. Conflicts will most frequently occur at the Initial Review level, where other directives establish committees to review specific issues.

Cross References:  DC-ADM 801, DC-ADM 802

ACA Cross-References:  3-4271

cc:  Executive Deputy Commissioner Reid
     Deputy Commissioner Clymer
     Deputy Commissioner Fulcomer
     Acting Deputy Commissioner Beard
     All Superintendents
     CCC Directors (4)
     File

Joseph D. Lehman,
Commissioner



| | |
|---|---|
| | **Bulletin**<br>**Commonwealth of Pennsylvania ● Department of Corrections** |

| **To:** | **Policy Subject:** |
|---|---|
| **Superintendents**<br>**Boot Camp Commander**<br>**Regional Directors**<br>**Executive Staff** | **DC-ADM 804**<br>**CONSOLIDATED INMATE GRIEVANCE**<br>**REVIEW SYSTEM** |
| | **Policy Number:**    **DC-ADM 804-1** |
| | **Policy Issue Date: July 20, 1994** |

| **Date of Issue:**<br>April 2, 1996 | **Authority:** | **Effective Date:**<br>May 20, 1996 |
|---|---|---|

The purpose of this Bulletin is to include medical grievances in the regular grievance process and to **discontinue** the Central Office Medical Review Committee (COMRC). .

It is important that the Superintendent be aware of all functions within the institution. Similarly, it is essential that the Bureau of Health Care Services be included in the CORC process, to include review by the Chief Counsel's office with respect to medical grievances. Therefore, all grievances, including those relating to medical issues, are to be processed in the same manner. The grievance coordinator will continue to forward medical grievances to the CHCA for initial review. Then, the Superintendent will be responsible for the Appeal from Initial Review, as for all other grievances.

Final Appeal of medical grievances will no longer be forwarded to the COMRC. The Central Office Review Committee (CORC) will process the appeals. The Director of the Bureau of Health Care Services, or designee, will participate as a member of CORC for all medical grievance appeals.

The following sections of DC-ADM 804 are to be **discontinued:**

    IV.E.:     Definition of COMRC

    IV.G.:     "An appeal of the Initial Review decision on a grievance related to a Health Care or Medical Issue shall be submitted directly to the COMRC at Central Office.

    V.D.:     "It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review."



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Executive Staff<br>Superintendents<br>Regional Directors | Policy Subject: | Consolidated Inmate<br>Grievance Review System |
|---|---|---|---|

**Policy Number:** DC-ADM 804-2

**Policy Issue Date:** July 20, 1994

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| October 1, 1997 | | November 1, 1997 |

The procedures for appeal to final review under DC-ADM 804, VI, D, 5-7, are amended as follows:

(1)     The Chief Hearing Examiner will replace the Central Office Review Committee (CORC) at final review of all grievance appeals. The Chief Hearing Examiner will perform all functions previously performed by CORC.

(2)     In reviewing grievances submitted for final review, the Chief Hearing Examiner will review the initial grievance and response, any appeals therefrom and the responses thereto and the issues appealed to final review.

(3)     The Chief Hearing Examiner will review health care related grievances with the Bureau of Health Care. Appeals raising legitimate legal issues, including but not limited to access to courts and sentencing issues, will be reviewed with an attorney prior to response.

(4)     Upon completion of final review, the Chief Hearing Examiner will respond directly to the inmate in all cases where the position taken by the institution is upheld.

(5)     In all cases where the action of the Grievance Coordinator, PRC, Incoming Publication Review Committee, or Superintendent is reversed or amended, or where a matter is remanded, the Chief Hearing Examiner will prepare a letter to the inmate and a memorandum to the Superintendent. The Chief Hearing Examiner will forward the letter and memorandum to the appropriate Regional Deputy Commissioner for review and signature.

(6)     The Chief Hearing Examiner will be responsible for assuring that:

(a)     appeals to final review are responded to in a timely fashion;
(b)     records pertaining to such appeals are maintained properly; and
(c)     counsel for the ICU class is notified of the disposition at final review of any matter raised to final review alleging a violation of the ICU vs Shapp Consent Decree.

It is the intent of the Department of Corrections to provide inmates with a complete and timely review of



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Executive Staff<br>Superintendents<br>Regional Directors<br>Boot Camp Commander | Policy Subject: | Consolidated Inmate<br>Grievance Review System |
|---|---|---|---|

**Policy Number:** DC-ADM 804-3

**Policy Issue Date:** July 20, 1994

| Date of Issue:<br><br>October 21, 1997 | Authority: | Effective Date:<br><br>November 1, 1997 |
|---|---|---|

The purpose of this bulletin is to facilitate timely responses from the Chief Hearing Examiner's Office to all appeals to final review.

(1) All appeals to final review should be addressed to the Chief Hearing Examiner,

> Chief Hearing Examiner
> 1451 S. Market Street
> Elizabethtown, PA 17022

Appeals which are addressed to the Commissioner, Chief Counsel, to other Central Office staff, are of course, delivered to these individuals first, then have to be referred to the Chief Hearing Examiner. Improperly addressed appeals may cause a delay in the response to final appeal.

(2) Inmates appealing to final review are responsible for providing the reviewing body with any available paperwork relevant to the appeal. A proper appeal to final review should include photocopies of the initial grievance, initial grievance response, and the Superintendent's response. Appeals without proper records will be reviewed, but the review will be delayed until the appropriate paperwork can be obtained.



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Policy Subject: |
|---|---|
| Executive Staff<br>Superintendents<br>CCC Regional Directors<br>Boot Camp Commander | Consolidated Inmate Grievance Review System |

**Policy Number:** DC-ADM 804-4

**Policy Issue Date:** July 20, 1994

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| April 29, 1998 | Martin F. Horn | May 1, 1998 |

The purpose of this bulletin is to amend the section VI. Procedures, A.4. to read,

"All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text must be legible and presented in a courteous manner. The Grievant should identify any persons who may have information which could be helpful in resolving the grievance. The Grievant may specifically raise any claims concerning violations of Department of Corrections directives, regulations, court orders, or other law. The Grievant may also include a request for compensation or other legal relief normally available from a court. The inmate may request to be personally interviewed at initial review. Any inmate who submits a grievance containing false information may be subject to disciplinary action. Inmates who have not already completed final review may request compensation or legal relief on appeal to final review."

And to amend Section VI. Procedures, B. Initial Review, 2. to read:

"Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause. Such extensions will normally be granted if the events complained of would state a claim of violation of federal right.

UNREPORTED/NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 99-1971

_____

LARRY GEISLER,
Appellant

v.

STANLEY HOFFMAN, DR.;
DONALD T. VAUGHN

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-CV-3764
District Judge:  The Honorable John R. Padova

_____

Argued:  September 12, 2000

_____

Before: NYGAARD, ROTH, and BARRY, Circuit Judges

(Opinion Filed:  September 29, 2000 )

_____

MEMORANDUM OPINION OF THE COURT

_____

BARRY, Circuit Judge

Appellant Larry Geisler, a former prisoner at SCI-Graterford, appeals separate orders

of the District Court which granted motions to dismiss his civil rights action against appellees

Dr. Stanley Hoffman and Superintendent Donald T. Vaughn. The District Court dismissed

Geisler's action against Dr. Hoffman for failure to exhaust administrative remedies and

dismissed the action against Superintendent Vaughn on the merits.[1]  In this appeal, Geisler

seeks reversal of the orders of dismissal and adds a constitutional challenge to 42 U.S.C. §

1997e(a), a challenge he did not raise before the District Court.[2]  For the reasons set forth

below, we will affirm.

The facts underlying this case, as sympathetic as they are to Geisler, are well-known

to the parties involved and will not be repeated here.  Despite that sympathetic story,

however, we must follow the mandate of Congress in 42 U.S.C. § 1997e(a), as interpreted

---

[1] Superintendent Vaughn argues that because Geisler's brief on appeal fails to address the merits of his claim against him, much less tell this Court why, in his opinion, the District Court erred in dismissing the action as to him, that order of dismissal is not properly before us for review.  We agree.  "An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before t[he] court."  Laborers' Int'l Union of No. Am. v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) (quoting Simmons v. City of Philadelphia, 947 F.2d 1042, 1066 (3d Cir. 1991), cert. denied, 503 U.S. 985 (1992)); see also Penn. Dept. of Public Welfare v. U.S. Dept. of Health and Human Services, 101 F.3d 939, 944 (3d Cir. 1996).  The remainder of this opinion will, therefore, address only Geisler's appeal from the dismissal of Dr. Hoffman and we will affirm as to Superintendent Vaughn without further discussion.

[2] We have consistently refused to consider issues that are raised for the first time on appeal.  See Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994); Richerson v. Jones, 572 F.2d 89, 97 (3d Cir. 1978) (noting that "refusing to consider on appeal an issue or argument not raised below normally promotes the finality of judgments and conserves judicial resources").  While there is a "manifest injustice" exception to this Court's rule against consideration of new legal issues on appeal, this rarely-applied exception is not triggered here.  We, therefore, will not consider Geisler's challenge to § 1997e(a).

by this Court, and affirm the dismissal as to Dr. Hoffman because Geisler simply did not exhaust his administrative remedies as to the monetary relief he now seeks.

The plain language of 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act ("PLRA"), makes clear that: "No action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or other correctional facility *until such administrative remedies as are available are exhausted.*" 42 U.S.C. § 1997(e)(a) (emphasis added). As we determined in Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000), Congress intended for the PLRA to amend "§ 1997e(a) in such a way as to make exhaustion of all administrative remedies mandatory–*whether or not they provide the inmate-plaintiff with the relief he says he desires in his federal action.*" The decision in Nyhuis – a Bivens action –  to reject a "futility" exception to § 1997e(a) and to regard the exhaustion requirement as unqualified has been extended to § 1983 claims. See Booth v. Churner, 206 F.3d 289, 300 (3d Cir. 2000) ("[T]he rule we announced in Nyhuis has equal force in the § 1983 context . . . for § 1997e(a) treats Bivens actions and § 1983 actions as functional equivalents."), petition for cert. filed, 68 U.S.L.W. 3774 (U.S. June 05, 2000) (No. 99-1964).

As the record reveals and Geisler's counsel concedes, Geisler failed to utilize all three of the tiers of the administrative appeals process provided for by the Pennsylvania Department of Corrections via the Consolidated Inmate Grievance Review Procedure ("DC-ADM 804"). While Geisler claims to have filed a grievance to have his J tube reimplanted

and arranged to have an inmate file a second grievance on his behalf, he admittedly never went beyond that initial step within the formal appeals process outlined in DC-ADM 804. Moreover, the failure of the prison officials to formally respond in writing to these grievances did not, contrary to Geisler's argument, relieve him of the obligation of exhausting the requisite administrative remedies. DC-ADM 804 does not prohibit prisoners from appealing the failure of prison officials to act on initial grievances and, therefore, Geisler was statutorily constrained to bring his grievances to the next level within the prison grievance scheme before pursuing relief in the judicial forum. And, we note, Geisler's grievances sought relief wholly different from the monetary remedy that he subsequently sought from the District Court. To this end, even if Geisler had brought his grievances before the two appellate tiers provided for by DC-ADM 804, exhaustion in that setting clearly would not have exhausted his current claim for monetary relief, a claim which he never even began to pursue administratively.

In this connection, Geisler cannot be heard to argue that seeking monetary damages in the administrative setting would have been "futile." First of all, DC-ADM 804 made awards of monetary relief available to inmates as of May 1, 1998 — well before Geisler filed his federal complaint in July 26, 1999; if the very relief Geisler sought in the judicial forum was first available to him in the administrative forum, a grievance in that forum could not have been "futile." Second, even if administrative remedies had not been available to Geisler via DC-ADM 804, any attempt to invoke a "futility" exception would be denied in light of

4

Nyhuis and Booth. See Nyhuis, 204 F.3d at 70-77 (explaining that Congress, via the PLRA, intended for exhaustion to be an unqualified requirement in prisoner civil rights litigation in an attempt to conserve judicial resources and to give deference to and promote the efficacy of administrative processes); Booth 206 F.3d at 300 (same).

In sum, Geisler's complaint fits squarely within the dictates of § 1997e(a), as interpreted by this court in Nyhuis and Booth, that a prisoner exhaust the administrative remedies available to him or her prior to initiating suit in federal court. Because Geisler failed to exhaust the three-tiered administrative appeals process with respect to both (1) his request to have his J tube reimplanted and (2) his current request for monetary damages attributable to the time he was deprived of the J tube, the District Court properly granted Dr. Hoffman's motion to dismiss.

We make, however, one observation. While Nyhuis and Booth compel us to uphold the dismissal of Geisler's complaint for failure to exhaust, we note that exhaustion is a two-way street with obligations on the part of prison officials as well as on the part of the prisoner. In Nyhuis, this Court stated that "applying § 1997e(a) without exception promotes the efficacy of the administrative process itself . . ." Nyhuis, 204 F.3d at 76. We anticipated that under a strict exhaustion requirement "prison grievance procedures will receive enhanced attention and improved administration." Id. While the state's failure to formally respond to Geisler's grievances – and on a motion to dismiss both the filing of the grievances and the failure to respond must be accepted as true – does not constitute a ground for

excusing Geisler from exhausting the administrative appeals process, such failure is wholly inconsistent with the "cooperative ethos . . . between inmate and jailer" which this Court envisioned a strict exhaustion requirement would promote. Id. at 77. In response to the inattention in this case, we issue a simple yet stern reminder: federal courts and prisoners alike depend upon prison officials to take seriously their roles within the relevant administrative grievance scheme. Only prompt attention and formal, guided response to timely prisoner grievances will facilitate the overarching policies of the PLRA.

TO THE CLERK OF THE COURT:

    Kindly file the foregoing Memorandum Opinion.

                                /s/ Maryanne Trump Barry
                                Circuit Judge

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1971

LARRY GEISLER,
Appellant

v.

STANLEY HOFFMAN, DR.;
DONALD T. VAUGHN

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-CV-3764
District Judge:  The Honorable John R. Padova

Argued: September 12, 2000

Before: NYGAARD, ROTH, and BARRY, Circuit Judges

(Opinion Filed: September 29, 2000 )

JUDGMENT

This cause came to be heard on the record from the United States District Court for

the Eastern District of Pennsylvania and was argued on September 12, 2000.

After consideration of all contentions raised by the appellant, it is

ADJUDGED and ORDERED that the judgments of the District Court be and are hereby affirmed.

Costs taxed against appellant.

*Marcia M. Waldron*

Marcia M. Waldron, Clerk

Dated: September 29, 2000

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL C. PEOPLES, Plaintiff, vs. COMMISSIONER HORN, et al. Defendants.

CIVIL ACTION NO. 3:CV-97-0205

(JUDGE CONABOY)

FILED SCRANTON DEC 31 1997 DEPUTY CLERK

MEMORANDUM AND ORDER

Presently before the Court is a Report and Recommendation filed by United States Magistrate Judge Thomas M. Blewitt. (Doc. 90). The Magistrate Judge recommends that the Plaintiff's complaint be dismissed in its entirety because the Plaintiff has failed to exhaust his administrative remedies. The Plaintiff has not filed any objections to the Magistrate Judge's disposition.[1] Thus, after carefully reviewing the Report and Recommendation only for plain error or manifest injustice, Cipollone v. Liggett Group, Inc., 822 F.2d 335, 340 (3d Cir. 1987) cert. denied, 484 U.S. 976 (1987); Henderson v. Carlson, 812 F.2d 875, 878 (3d Cir. 1987), cert. denied 484 U.S. 837 (19487), we shall adopt the Report and

[1] Although the Plaintiff has filed a motion for enlargement of time to file an objection to the Magistrate Judge's recommended disposition (Doc. 92), we deny it as moot in light of our determination made in this Memorandum and Order. Based upon our review, the Plaintiff has clearly failed to exhaust his administrative remedies. Accordingly, his complaint is dismissed without prejudice.

Recommendation of the Magistrate Judge and dismiss the complaint in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 claiming numerous violations of his First, Fourth, Fifth, Sixth, Eighth, and Fourteenth amendment rights. (Doc. 1). He is an inmate at the State Correctional Institution at Smithfield and is proceeding pro se. The Plaintiff filed an amended complaint on May 6, 1997. (Doc. 16).

The Defendants have filed a number of motions to dismiss. (Docs. 19, 27, 44, 47 and 50). However, not all of the motions are ripe for disposition. Nevertheless, our preliminary review of this action directs us to dismiss the complaint based upon the Plaintiffs failure to exhaust his administrative remedies.

## DISCUSSION

With respect to the applicability of administrative remedies, 42 U.S.C. § 1997e(a) reads as follows:

> No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

This provision makes no distinction between an action for damages, injunctive relief, or both. Thus, prisoners are required to exhaust available administrative remedies prior to initiating a

2

prison conditions case brought pursuant to 42 U.S.C. § 1983 or any other federal law.

The Pennsylvania Department of Corrections has a Consolidated Inmate Grievance review System. DC-ADM 804 (effective October 20, 1994). With certain exceptions not applicable here, DC-ADM 804, Section VI ("Procedures") provides that , after attempted informal resolution of the problem, a written grievance may be submitted to the Grievance Coordinator; an appeal from the Coordinator's decision may be made in writing to the Facility Manager or Community Corrections Regional Director; and a final written appeal may be presented to the Central Office Review Committee. If the grievance concerns an alleged medical problem any appeal must be taken to the Central Office Medical Review Committee.

The instant suit concerns the Plaintiffs alleged violation of his First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights. On the question of administrative exhaustion, the complaint includes a question relating to what steps the prisoner took in the state prisoner grievance procedure. The Plaintiff indicates that although he filed "DC-304 Part I Grievances" with respect to his medical and non-medical grievances, they "were put down via semantics, et., etc., etc. And I was pursecuted (sic) because of my efforts to obtain relief." (Doc. 1, p. 2). There is no indication that he appealed the dismissal of this grievance. In that connection, the procedure contemplates several tiers of review and the Grievance Review System is not exhausted when an inmate files a grievance and then takes no other action through established chan-

nels when a grievance is not resolved to his or her satisfaction. Plaintiff's apparent failure to comply with 42 U. S. C. § 1997e(a), as amended, warrants the dismissal of his complaint but without prejudice. <u>See</u> <u>Pew v. Imschweiler</u>, <u>et al.</u>, Civil Action No. 96-0760 (M.D. Pa. September 12, 1996) (Kosik, J.); <u>Johnson v. Gillis</u>, <u>et al.</u>, Civil Action No. 96-1569 (M.D. Pa. August 29, 1996) (Conaboy, J.); <u>Lubawski v. Horn</u>, <u>et al.</u>, Civil Action No. 96-1371 (M.D. Pa. July 29, 1996) (Rambo, C.J.); <u>Smith v. Giza</u>, Civil Action No. 96-1167 (M.D. Pa. July 2, 1996) (Rambo, C.J.); <u>Brooks v. Superintendent Lunk of Div. 10</u>, <u>et al.</u>, No. 96C3221, 1996 WL 308268 (N.D. Ill. June 5, 1996).

_Richard P. Conaboy_
Richard P. Conaboy
United States District Judge

DATE: 12/31/97

4

Not Reported in F.Supp.
(Cite as: 1997 WL 43015 (E.D.Pa.))

Bilal A. MUHAMMAD, Plaintiff,
v.
Dr. Arnold SCHWARTZ, Dr. John Roeder and
Dr. Josey Malabranch, Defendants.

Civil Action No. 96-CV-6027.

United States District Court, E.D. Pennsylvania.

Jan. 27, 1997.

Bilal A. Muhammad, Graterford, PA, Pro Se.

Alan S. Gold, Monaghan & Gold, P.C., Elkins
Park, PA, for Defendants.

MEMORANDUM AND ORDER

VAN ANTWERPEN, District Judge.

I. INTRODUCTION

*1 On August 29, 1996 Plaintiff Bilal A.
Muhammad filed a complaint against Dr. Arnold
Schwartz, Dr. John Roeder, and Dr. Josey
Malabranch pursuant to 42 U.S.C. § 1983 alleging
cruel and unusual punishment via deliberate
indifference to his medical needs in violation of
the Eighth and Fourteenth Amendments to the
United States Constitution. Mr. Muhammad also
asserts a Pennsylvania state law claim of medical
malpractice. This court has jurisdiction via    §
1983, and through our assertion of pendent
jurisdiction over the state law claim per 28 U.S.C.
§ 1367.

In their instant motion, Dr. Schwartz and Dr.
Roeder request that the action against them be
dismissed for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dr. Malabranch was
never properly served; the complaint against her
is therefore dismissed without prejudice. The
issue before us consists solely of whether Mr.
Muhammad alleged sufficient facts within his
complaint to support his § 1983 action against Dr.
Schwartz and Dr. Roeder.

II. DISCUSSION
A. Failure to State a Claim

Pursuant to Federal Rule of Civil Procedure
12(b)(6), this court must dismiss a complaint if it

fails to state a claim upon which relief can be
granted. A complaint should not be dismissed for
failure to state a claim unless the plaintiff has
alleged no set of facts in support of his claim
which would entitle him to relief. Scheuer v.
Rhodes, 416 U.S. 232, 236 (1974); Haines v.
Kerner, 404 U.S. 519, 520 (1972). This court's
inquiry is essentially limited to the content of the
complaint. Biesenbach v. Guenther, 588 F.2d
400, 402 (3d Cir.1978). All allegations in the
complaint and all reasonable inferences that can be
drawn therefrom must be accepted as true and
viewed in the light most favorable to the non-
moving party. Nami v. Fauver, 82 F.3d 63, 65
(3d Cir.1996); Holder v. City of Allentown, 987
F.2d 188, 194 (3d Cir.1993). However, "we are
not required to accept legal conclusions either
alleged or inferred from the pleaded facts." Kost
v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993).
Further, if "the facts alleged in the complaint,
even if true, fail to support the ... claim," we
must dismiss the complaint. Id. (citing Ransom v.
Marrazzo, 848 F.2d 398, 401 (3d Cir.1988). In a
Section 1983 action, a motion to dismiss will be
granted if the plaintiff does not sufficiently allege
in his complaint the deprivation of any right
secured in the Constitution. Nami, 82 F.3d at 65.

B. Factual Allegations

We therefore review Mr. Muhammad's
allegations as contained solely within his
complaint in the light most favorable to him. Mr.
Muhammad is currently incarcerated at S.C.I.
Graterford Prison in Graterford, Pennsylvania.
He states in his complaint that on December 19,
1994 at approximately 5:00 p.m. he was rushed to
the dispensary with complaints of severe stomach
and back pains. Complaint at 2. Mr. Muhammad
was seen by Defendant Dr. Roeder, and
complained to him that was vomiting and thought
he had food poisoning. Mr. Muhammad alleges
that Dr. Roeder then prescribed Donatol and
Maalox to him; however, Dr. Roeder did not take
"blood pressure readings and/or a finger stick for
blood sugar reading along with temperature
readings to determine whether infection was
present." Complaint at 3. Mr. Muhammad
alleges that his medical records indicated a pre-
existing problem with diabetes, hypertension, and
kidney stones. Id. In addition, he states that a
nurse at the infirmary "attempted to convince

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1997 WL 43015, *1 (E.D.Pa.))

defendant Dr. Roeder that [he] had problems in the past dealing with kidney stones." Id. Mr. Muhammad does not allege that he suggested any alternative diagnosis to Dr. Roeder other than his initial complaint of food poisoning.

**\*2** Later on December 19, 1994, at approximately 8:00 p.m., Mr. Muhammad alleges that he was brought back to the dispensary to see Dr. Malabranch for vomiting and pains. After a discussion about Mr. Muhammad's concerns with his kidneys, Dr. Malabranch prescribed Demoral. Mr. Muhammad alleges that "at no time [were his] procedural vital signs taken by defendant Dr. Malabranch." Complaint at 5. Mr. Muhammad then returned to his cell; he states that he was in severe pain. He alleges that a nurse requested that he be sent to a hospital, but this request was denied at that time. Id.

At approximately 6:00 a.m. on December 20, 1994 Mr. Muhammad states that he applied for sick call for treatment "relating to his stomach and back pains" and vomiting. Complaint at 7. He was now seen by Dr. Schwartz, who prescribed Motrin for the pain and referred him to the Medical Director, Dr. Dennis Moyer. [FN1] Dr. Moyer ordered that x-rays be taken and placed Mr. Muhammad on medical layin from work. Mr. Muhammad returned to his cell and, being in pain, took the Motrin previously prescribed. Id.

FN1. Dr. Moyer is not a defendant in this matter.

Two days later, on December 22, 1994, Mr. Muhammad signed up for "routine sick call" and was seen again by Dr. Schwartz. He complained of "severe back pains associated with kidney stone presence and intense chills, along with vomiting." Complaint at 7. Mr. Muhammad alleges that Dr. Schwartz did not take his blood pressure, but did prescribe Motrin. He also alleges that approximately one half hour later he "fell to the floor" and was brought to the dispensary. Complaint at 8. There, he was seen by Dr. Moyer. Mr. Muhammad's allegations are unclear subsequent to that, but it appears that he was admitted to Suburban General Hospital on December 24, 1994 with severe kidney problems.

C. Deliberate Indifference

1. Legal Standard

The gravamen of Mr. Muhammad's Section 1983 action is that Drs. Roeder and Schwartz subjected him to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the states by the Fourteenth Amendment. See Robinson v. California, 370 U.S. 660 (1962). Because an inmate must rely on prison officials for their medical care, denial of same can result in pain and suffering that rises to the level of a constitutional violation. See Estelle v. Gamble, 429 U.S. 97, 103 (1976). However, the law is clear that failure to provide adequate medical treatment is a violation of the Eighth Amendment only when it results from "deliberate indifference to a prisoner's serious illness or injury." Id. at 105.

The Supreme Court clarified this standard in Wilson v. Seiter, 501 U.S. 294 (1991). They held that "to establish an Eighth Amendment violation an inmate must allege both an objective element-- that the deprivation was sufficiently serious--and a subjective element--that a prison official acted with a sufficiently culpable state of mind, i.e. deliberate indifference." Nami v. Fauver, 82 F.3d 63, 67 (3d Cir.1996) (citing Wilson 501 U.S. at 304); Young v. Quinlan, 960 F.2d 351, 359-60 (3d Cir.1992). The first element requires that the doctor's act or omission "result in the denial of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1977 (1994) ("the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm"). To be sure, Mr. Muhammad has alleged a very serious injury: that he suffered bilateral kidney failure. For purposes of this discussion only, we will accept that this is sufficient to satisfy the first element.

**\*3** However, it is not clear that he has alleged sufficient facts to show the second element: that Drs. Schwartz and Roeder acted with a sufficiently culpable state of mind. The Supreme Court has held that when a prison official commits an act or omission that does not purport to be "punishment," there must be more than an ordinary lack of due care; there must be deliberate indifference, or the "unnecessary and

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1997 WL 43015, *3 (E.D.Pa.))

wanton infliction of pain." Estelle, 429 U.S. at 104; Whitley v. Albers, 475 U.S. 312, 319 (1985); Young v. Quinlan, 960 F.2d 351, 359 (3d Cir.1992). In Farmer v. Brennan, 114 S.Ct. 1970 (1994), the Supreme Court discussed "deliberate indifference" in more detail. It is clear that the required state of mind is more than negligence in diagnosing or treating a medical condition, but less than acts or omissions committed for the very purpose of causing harm or with the knowledge that the specific harm will result. Farmer, 114 S.Ct. at 1978. The Farmer court adopted subjective recklessness as the appropriate test, holding that a "prison official cannot be found liable under the Eighth Amendment ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Id. at 1979; see also, Nami, 82 F.3d at 67. If the official should have perceived a risk, but did not, his acts or omissions cannot establish a constitutional violation. Alleging obviousness or constructive notice is insufficient to state a claim because liability may not be prefaced on these alone, and if a prison official was not aware of even an obvious risk there can be no constitutional violation. Farmer, 114 S.Ct. at 1980, 1982.

In this light, it is clear that to establish his claim, Mr. Muhammad must allege facts that at a minimum show recklessness on the part of Dr. Schwartz and Dr. Roeder. [FN2] It is insufficient to allege that the doctors "misdiagnosed [his] condition, that [the doctors'] method of physical examination and treatment may not have followed community standards, or that [the doctors] disagreed with [his] suggested course of treatment." Bellecourt v. United States, 994 F.2d 427, 431 (8th Cir.1993), cert. denied, 510 U.S. 1109 (1994); see also Estelle, 429 U.S. at 106. Malpractice, while not condoned by this court, is simply not actionable under Section 1983. See Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir.1993); Sample v. Diecks, 885 F.2d 1099, 1109 (3d Cir.1989). Malpractice indicates negligence on the part of the physician, and "negligence in the administration of medical treatment is not itself actionable under the Constitution." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir.1979) (citing

Estelle, 429 U.S. at 105); see also Jordan v. Fox, 20 F.3d 1250, 1277 (3d Cir.1994). Neither, certainly, is a disagreement between the plaintiff and the doctor on the medical diagnosis. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326 (3d Cir.1987), cert. denied, 486 U.S. 1006 (1988); Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir.1990). Because "there may, for example, be several ways to treat an illness," prison doctors have been accorded considerable latitude in the diagnosis and treatment of prisoners. Durmer, 991 F.2d at 67; Inmates of Allegheny County Jail, 612 F.2d at 762; White, 897 F.2d at 110.

> FN2. Some courts have held that because the element of deliberate indifference involves a discussion of intent, this sort of Eighth Amendment claim cannot be resolved at summary judgment; however, the complaint is certainly subject to dismissal for failure to state a claim if no such subjective intent is alleged in the first place. See Young 960 F.2d at 360.

*4 In finding deliberate indifference, courts have generally noted length of time without treatment, the types of complaints made by the prisoner, and the specific responses of the doctor. See Durmer, 991 F.2d at 67 (prisoner went over seven months without treatment, prisoner complained repeatedly of pain over that time, non-medical reasons given for denial); White v. Napoleon, 897 F.2d 103, 109 (3d Cir.1990) (well over ten different instances with several prisoners over many months, repeated complaints, direct comments and actions by doctor which indicate no medical purpose); Lanzaro, 834 F.2d at 347 ("deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care to suffering inmates"). The Third Circuit specifically found that allegations that a doctor "intended to inflict pain on prisoners without any medical justification," or a large number of "specific instances in which the doctor insisted on continuing courses of treatment that the doctor knew were painful, ineffective, or entailed substantial risk of serious harm to the prisoners" were distinguishing factors of a case that went beyond mere malpractice. White, 897 F.2d at 109.

2. Discussion

Not Reported in F.Supp.
(Cite as: 1997 WL 43015, *4 (E.D.Pa.))

Page 4

For Mr. Muhammad's claims of deliberate indifference, each doctor must be examined separately from the other. See Polk County v. Dodson, 454 U.S. 312, 325 (1981) (holding that because respondeat superior is not a basis for liability under § 1983, one doctor at a prison cannot be held liable for actions of others); Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir.1993). We will therefore examine Mr. Muhammad's allegations with respect to Dr. Roeder first.

Dr. Roeder saw Mr. Muhammad once, when he was first brought to the dispensary on December 19, 1994. Mr. Muhammad complained of stomach and back pains and indicated that he thought it might be food poisoning. Based on this, Dr. Roeder prescribed Donatol and Maalox for treatment of the pain and possible food poisoning, and returned Mr. Muhammad to his cell. Mr. Muhammad does not allege that Dr. Roeder was involved subsequent to this. He does allege that a Nurse, Connie Chubb, told Dr. Roeder about his history of kidney stones.

These allegations are insufficient, even when taken in a light most favorable to Mr. Muhammad, to make out a § 1983 action. Mr. Muhammad does not allege that Dr. Roeder actually knew that the prescriptions issued to Mr. Muhammad would cause further harm. He merely disagrees with the diagnosis, with the ease of twenty-twenty hindsight. He does not allege that Dr. Roeder knew that Mr. Muhammad faced the serious risk of kidney failure, and issued a prescription for Donatol and Maalox in reckless disregard for that risk. He merely states that a history of kidney stones and diabetes was listed in his medical records. This is not deliberate indifference per Farmer v. Brennan. Without alleging actual knowledge, any reference to obviousness via the medical records available, or what the doctor "should have known" is unavailing.

*5 Dr. Schwartz saw Mr. Muhammad twice. The first time was on the morning of December 20, 1996 at a "sick call screening." Mr. Muhammad alleges in his complaint that he had continued stomach and back pains, and vomiting. Dr. Schwartz prescribed Motrin to alleviate his pain, and referred him to the Medical Director,

Dr. Moyer. Mr. Muhammad does not allege any conversation or discussion of his case between Dr. Schwartz and his supervisor, only that the doctor screened him, prescribed him medication for his pain, and referred him to the director.

Dr. Schwartz did not see Mr. Muhammad again until two days later, on December 22, 1994, when Mr. Muhammad signed up for "routine sick call." Dr. Schwartz listened to Mr. Muhammad's complaints, and again prescribed Motrin for his pain. Mr. Muhammad does not state whether or not he took that medication, but it was soon thereafter that he was brought to the dispensary to again be examined by Dr. Moyer. Mr. Muhammad does not allege that Dr. Schwartz had any other contact with him. He does not allege that Dr. Schwartz did or said anything with the knowledge that his actions would cause Mr. Muhammad further harm. Rather, he disagrees with his method of diagnosis, and the diagnosis itself. He does not contest that at any time his complaints were ignored, or that prescriptions were not provided. Mr. Muhammad, simply, has alleged malpractice; in this case, his allegations do not rise to the level required by the deliberate indifferent indifference. See Farmer 114 S.Ct. at 1984; Bellecourt, 994 F.2d at 431.

For both Dr. Schwartz and Dr. Roeder, Mr. Muhammad asserts that their diagnosis was wrong, and that they therefore delayed his admittance at a local hospital. However, Mr. Muhammad first complained of pains in the afternoon of December 19, 1994, and was admitted to the hospital on December 24, 1994 after being in Dr. Moyer's care for two days. While Mr. Muhammad undoubtedly suffered a severe injury, he has not--and, it seems, can not--alleged that Drs. Schwartz and Roeder were actually aware of the risks to his health caused by their actions, and that they recklessly disregarded those risks. Mere mention of a medical record listing a history of kidney stones is insufficient to show that the risk to Mr. Muhammad was so obvious it had to have been known. Cf., Farmer, 114 S.Ct. at 1981. The facts reveal instead a pattern of Mr. Muhammad complaining of pain and receiving a responsive prescription, and then within five days of the onset of pain being sent to an outside hospital for further treatment. While the negligent malpractice of medicine upon

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1997 WL 43015, *5 (E.D.Pa.))

prisoners is unfortunate and will certainly not be condoned by this court, the actions of Dr. Schwartz and Dr. Roeder do not rise to "cruel and unusual punishment" prohibited by the Eighth and Fourteenth Amendment. The complaint must therefore be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

### D. State Malpractice Claim

*6 We had originally exerted jurisdiction over the second count in Mr. Muhammad's complaint, a state malpractice claim, via pendant jurisdiction. However, because we have dismissed the federal Section 1983 claim above, we have no independent basis to hear the state law claim. Ordinarily, when a court dismisses a federal claim early on in the case, it will not use its discretion to retain jurisdiction over any pendant claims, but rather will dismiss the state claims without prejudice to raise the matters in state court. Angst v. Mack Trucks, 969 F.2d 1530, 1534-5 (3d Cir.1989); Panis v. Mission Hills Bank, 60 F.3d 1486 (10th Cir.1995), cert. denied, 116 S.Ct. 1045 (1996); See 28 U.S.C. § 1367(c)(3). We see no reason to do otherwise in this case. We do not express any opinion on the outcome of the malpractice claim in the appropriate state court.

### III. CONCLUSION

Despite an examination of Mr. Muhammad's complaint in a light most favorable to him, we find that he has not alleged facts sufficient to make out a Section 1983 claim.

For the foregoing reasons, we will grant Defendants Dr. Schwartz and Dr. Roeder's motion to dismiss count one of Mr. Muhammad's complaint for failure to state a claim. We will dismiss Mr. Muhammad's pendant state malpractice claim without prejudice to bring the claim in the appropriate state court. We also dismiss without prejudice the complaint against Dr. Malabranch for failure to provide service.

An appropriate order follows.

### ORDER

AND NOW, this 27th day of January, 1997, upon consideration of Defendants Dr. Arnold Schwartz and Dr. John Roeder's Motion to Dismiss filed on January 3, 1997 and Plaintiff Bilal A. Muhammad's response thereto filed on January 13, 1997, it is hereby ordered, consistent with the foregoing opinion as follows:

1. Defendants' Motion to Dismiss is GRANTED as to Count I of the complaint;

2. Plaintiff's Count II is DISMISSED for lack of jurisdiction without prejudice to bring the action in the appropriate state court;

3. Plaintiff's complaint against Defendant Dr. Josey Malabranch is DISMISSED without prejudice for failure to provide service;

4. This case is CLOSED.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

*T٠lplrnder for tye*
*beep my burealar*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BENNIE OUTTERBRIDGE, as Administratrix   :
of the ESTATE OF EDDIE SAMUEL   :
OUTTERBRIDGE and in her own right,   :
  :
        Plaintiff,   :     CIVIL ACTION
  :     NO. 00-1541
        v.   :
  :
COMMONWEALTH OF PENNSYLVANIA,   :
DEPARTMENT OF CORRECTIONS, et al.   :
  :
        Defendants.   :

FILED

JUN - 8 2000

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## MEMORANDUM

BUCKWALTER, J.                                       June 7, 2000

        Presently before the Court is the Medical Defendants' Motion to Dismiss.  For the

reasons stated below, the Motion is Granted.

## I. BACKGROUND

        Plaintiff is the alleged Administratix of a decedent prisoner, Eddie Samuel

Outterbridge ("Outterbridge").  She filed the Complaint on March 24, 2000 alleging federal and

state claims against both the moving Medical Defendants[1] and the non-moving Commonwealth

Defendants.   This Court dismissed all claims against the Commonwealth Defendants by an

---

1.  The Medical Defendants will be the term used to refer to the following Defendants who provided medical
services at SCI-Mahanoy:  Lazlo Kiraly, M.D. ("Kiraly"), John Hipps, M.D. ("Hipps"); Stanley Hoffman, M.D.
("Hoffman"); John Rush, P.A.C. ("Rush"); Ronald Scott, P.A.C. ("Scott").   All five of these individuals were hired
by or contracted with Defendant Correctional Physician Services ("CPS").  During the time period relevant to this
suit, CPS entered into a contract to provide medical services to inmates at SCI-Mahanoy.

Order dated May 26, 2000. The federal claims against the Medical Defendants include a

violation of the Eighth Amendment and a conspiracy count. The state law claims involve

medical negligence, survival and wrongful death. The Complaint arises from the treatment and

medical care received by decedent Outterbridge that are alleged to have resulted in his death.

    According to the Complaint, Outterbridge began his incarceration at SCI-

Mahanoy in October, 1992. After receiving a positive tuberculin test in October, 1997,

Outterbridge began a prophylactic treatment termed INH. Although Outterbridge complained

repeatedly to treating physicians that the INH was making him ill, he was forced to continue the

medication. The Plaintiff alleges that Outterbridge's medical condition was continually

misdiagnosed by the individual Medical Defendants. He was finally removed from SCI

Mahanoy on April 15, 1998 and died ten days later at Good Samaritan Hospital in Pottsville,

Pennsylvania.

## II. LEGAL STANDARD

    Defendants argue that the case should be dismissed for lack of jurisdiction under

Fed. R. Civ. P. 12(b)(1). A motion to dismiss on jurisdictional allegations should be judged by

the same standards as a Rule 12(b)(6) motion to dismiss. See Mortenson v. First Federal Sav.

and Loan Ass'n, 549 F.2d 884, 890 (3d Cir. 1977). When deciding to dismiss a claim pursuant

to Rule 12(b)(6) a court must consider the legal sufficiency of the complaint and dismissal is

appropriate only if it is clear that "beyond a doubt ... the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief." McCann v. Catholic Health Initiative,

1998 WL 575259 at *1 (E.D. Pa. Sep. 8, 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46

(1957)).  The court assumes the truth of plaintiff's allegations, and draws all favorable inferences

therefrom.  See, Rocks v. City of Philadelphia, 868 F.2d. 644, 645 (3d. Cir. 1989).  However,

conclusory allegations that fail to give a defendant notice of the material elements of a claim are

insufficient. See Sterling v. SEPTA, 897 F.Supp. 893, 895 (E.D. Pa.1995).  The pleader must

provide sufficient information to outline the elements of the claim, or to permit inferences to be

drawn that these elements exist.  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d. Cir. 1993).  A court

must determine whether, under any reasonable reading of the pleadings, the law allows the

plaintiff a remedy.  See, Nami v. Fauver, 82 F.3d 63, 65 (3d. Cir. 1996).

## III. DISCUSSION

### A.   Count 1:  § 1983 claim for violation of the Eighth Amendment

The Plaintiff has included all of the Medical Defendants in Count 1.  The

Supreme Court has declared that, in accordance with the " 'broad and idealistic, concepts of

dignity, civilized standards, humanity, and decency' " embodied in the Eighth Amendment, the

government is obliged "to provide medical care for those whom it is punishing by incarceration."

Estelle v. Gamble, 429 U.S. 97, 102(1976).  Deliberate indifference to serious medical needs of

prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth

Amendment." Id. at 104.  To be in violation of the Eighth Amendment, there must be both

deliberate indifference on the part of the officials and a serious medical condition.  Monmouth

County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987).

The Supreme Court adopted a subjective test for what would constitute an Eighth

Amendment violation in Farmer v. Brennan, 511 U.S. 825, 837 (1994):

"A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference". Id.

Therefore, the Court continued, "... an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment". Id. at 838. Therefore, to state a § 1983 claim for a denial of medical treatment, the Plaintiff must specifically allege that each defendant was aware of the serious risk Outterbridge faced and that the person disregarded such risk.

After reviewing the Complaint, the Court finds that the Plaintiff has never alleged that any of the Medical Defendants drew inferences that Outterbridge faced a risk of serious harm. The Complaint repeats that each Defendant continued to treat Outterbridge with INH even though he complained of its effects. Plaintiff also alleges that the Medical Defendants "consciously disregarded" abnormal findings resulting from the ingestion of INH. While these facts suggest medical malpractice, they do not sufficiently allege that the Defendants knew of and disregarded the serious risk faced by decedent Outterbridge. Therefore, the Plaintiff's §1983 claims against the Medical Defendants will be dismissed.

Plaintiff has likewise failed to state a cause of action against CPS, as the employer of the individual Medical Defendants. The Third Circuit has repeatedly concluded that no respondeat superior liability exists pursuant to § 1983 under any circumstance. See Robinson v. City of Pittsburgh, 120 F.3d 1285 (3d Cir. 1997). Nevertheless, a private corporation may be held liable for a constitutional violation if it knew of and acquiesced in the deprivation of the

4

plaintiff's rights. See Miller v. Hoffman, 1998 U.S. Dist. LEXIS 9934. A Plaintiff must state

that the corporation, with deliberate indifference, established and maintained a policy which

directly caused plaintiff's constitutional harm. See Stoneking v. Bradford Area Sch. Dist., 882

F.2d 720, 725 (3d Cir. 1989). The Plaintiff has not alleged any policies of CPS that led to

constitutional harm suffered by Outterbridge.

B. Count 2: Conspiracy to Violate the Eighth Amendment:

The elements of a conspiracy are a combination of two or more persons to do a

criminal act, or to do a lawful act by unlawful means or for an unlawful purpose. Ammlung v.

City of Chester, 494 F.2d 811, 814 (3rd Cir.1974). The plaintiff must make specific factual

allegations of combination, agreement, or understanding among all or between any of the

defendants to plot, plan, or conspire to carry out the alleged chain of events. See Panayotides v.

Rabenold, 35 F.Supp.2d 411, 419 (E.D. Pa. 1999). Only allegations of conspiracy which are

particularized, such as those addressing the period of the conspiracy, the object of the conspiracy

and certain other actions of the alleged conspirators will be deemed sufficient. See Rose v.

Bartle, 871 F.2d. 331,366 (3d Cir. 1989). Drawing inferences in favor of the Plaintiff, it can be

assumed that the object of the conspiracy was to violate Outterbridge's constitutional rights by

remaining deliberately indifferent to his medical needs. It can also be inferred that the period of

the conspiracy lasted from the time IHN treatment was started until April 15, 1998, the day

Outterbridge was transferred out of SCI-Mahanoy. However, there are no specific allegations

that the Medical Defendant agreed to violate Outterbridge's right to medical treatment. In order

to survive a motion to dismiss, the Plaintiff can not baldy claim that Defendants actions and

omissions constituted a conspiracy without alleging what constituted concerted action. As stated

above, the Court finds that the Plaintiff did not sufficiently allege a substantive Eighth

Amendment violation.  Plaintiff has also failed to state a claim of conspiracy to violate decedent

Outterbridge's constitutional rights.  Therefore, Count 2 will be dismissed against all of the

Medical Defendants.

## IV.  CONCLUSION

        The Plaintiff has failed to allege any claims against the Medical Defendants that

would give this Court jurisdiction under 28 U.S.C. § 1331.  Since the Court no longer has

original jurisdiction over any claim in this case, the Court declines to exercise supplemental

jurisdiction over the remaining state law claims (see 28 U.S.C. § 1367(c)), unless the plaintiff

can successfully replead its alleged § 1983 claim.

        An order follows.

JUN-08-2000  15:48                                            P.07/09

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BENNIE OUTTERBRIDGE, as Administratrix    :
of the ESTATE OF EDDIE SAMUEL    :
OUTTERBRIDGE and in her own right,    :
    :
        Plaintiff,    :    CIVIL ACTION
    :    NO. 00-1541
    v.    :
    :
COMMONWEALTH OF PENNSYLVANIA    :
DEPARTMENT OF CORRECTIONS, et al.    :
    :
        Defendants.    :

## O R D E R

AND NOW, this 7th day of June, 2000, upon consideration of the Medical

Defendants' Motion to Dismiss (Docket No. 5), and the Plaintiff's Response thereto (Docket No.

10); it is hereby **ORDERED** that the Motion is **GRANTED** as to Counts 1 and 2 with respect to

the Medical Defendants.  It is **FURTHER ORDERED** that plaintiff is granted leave to file an

amended complaint if he can do so in accordance with this opinion.

If no such amended complaint is filed on or before **June 30, 2000**, the court, on

motion of defendant, will dismiss Counts 1 and 2 and decline to exercise supplemental

jurisdiction over the state claims.    COPIES BY FAX ON: _____

    TO: _____

'ERED: ____ 6-8-00 ____    BY THE COURT:

CLERK OF COURT    RONALD L. BUCKWALTER, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM R. BRANCH,                    :    CIVIL ACTION NO. 1:CV-95-0751
                                      :
            Plaintiff                 :
                                      :
      v.                              :
                                      :
TONY R. FABRICATORE, ET AL.,          :    (Chief Judge Rambo)
                                      :
            Defendant                 :

## MEMORANDUM AND ORDER

### Background

     This is a civil rights action filed under 42 U.S.C.
§ 1983[1] by William R. Branch, an inmate at the State Correctional
Institution, Waymart, Pennsylvania ("SCI-Waymart"). Defendants
are the following three individuals employed at SCI-Waymart: (1)
Tony Fabricatore, a dining room steward; (2) Donald Fiske, Health
Care Administrator; and (3) Blessing Homily, M.D. Branch claims
that Dr. Homily provided him with inadequate medical care in
violation of the Cruel and Unusual Punishments Clause of the
Eighth Amendment. In addition, Branch claims that Fabricatore
refused to let him go back to his cell block and rest after he

---

1.  A plaintiff, in order to state a viable § 1983 claim, must
plead two essential elements: 1) that the conduct complained of
was committed by a person acting under color of state law, and 2)
that said conduct deprived the plaintiff of a right, privilege, or
immunity secured by the Constitution or laws of the United States.
West v. Atkins, 487 U.S. 42, 48 (1988); Rotolo v. Borough of
Charleroi, 532 F.2d 920, 922 (3d Cir. 1976).

became ill.  There are no allega... spe...fically directed ...

Fiske.

The  ...llowing are in tota  ...e factual allegations set forth

in Branch's complaint, including the spelling and grammatical

errors:

> I reported to medical sick call on or about Feb. 27,
> 1994 because I had developed a rash on my back and foot.
> I was seen by the doctor who had then prescribed a cream,
> Nolizone.  I applied the cream to the affected areas.  The
> Nolizone helped a little but the doctor withdrew the medicine
> because he stated that I was using it too long.  He then
> prescribed, Lotrizone which had helped to clear up the rash.
> However, serious side effects have occurred since my using
> the Lotrizone.  I have developed female type breasts and
> other traits.  These are causing me much embarassment in
> "showering" and in changing in front of other inmates.  As
> a result I am suffering severe emotional distress, mental
> anguish, humiliation and shyness.  I then stopped using the
> medication and the rash reappeared.  I then went on sick call
> again because of it and I was told by Dr. Homily "to scratch
> it" THIS, a statement made by a professional doctor is
> clearly NON*Professional and a serious note of Malpractice.
> I am also including in the malpractice claim the fact that
> the doctor refuses to allow inmates to take time off when
> they are ill.  In fact, in my case I have had a cold for a
> long time because I go in and out of the freezer, etc.
> I cough and sneeze around the food which I handle.  When I
> asked Tony Fabricatore, the steward if I could go back to the
> block because I was sick he said  ...rget it Home".  I then
> vomited in front of him, I had aches  ...d pains, was in a cold
> sweat, and had chills.  He still refused to let me go back to
> the block to rest.

Complaint, Statement of Claim, Doc. of rec. 1.

Dr. Homily filed a motion to dismiss the complaint on

August 7, 1995.  That motion has been fully briefed and is ripe

for disposition.

## DISCUSSION

When considering a motion to dismiss for failure to state a claim, the court must take the complaint's allegations as true and construe them liberally in favor of the nonmoving party. <u>Shawley v. Bethlehem Steel Corp.</u>, 989 F.2d 652, 655 (3d Cir. 1993); <u>Sturm v. Clark</u>, 835 F.2d 1009, 1011 (3d Cir. 1987); <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974). Therefore, the complaint may only be dismissed if the court is convinced beyond a doubt that Branch can not prove any set of facts to support a claim which would permit a recovery. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957). Uncounseled litigants like Branch are entitled to a great deal of deference when the adequacy of their pleadings is called into question. <u>Haines v. Kerner</u>, 404 U.S. 519 (1972).

Viewing the complaint with all the liberality due Branch, he nonetheless has failed to state a constitutional claim against Dr. Homily. Claims based upon the Cruel and Unusual Punishments Clause have both objective and subjective components. <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991). Serious hardship to the prisoner is required to satisfy the Eighth Amendment's objective component. <u>Id.</u> The subjective component is met if the person or persons causing the deprivation acted with "a sufficiently culpable state of mind". <u>Id.</u> In order to state a valid claim that prison officials reneged on their obligation to provide constitutionally adequate medical care, an inmate must allege both deliberate indifference on the part of the officials (the

3

subjective element, and that the medical needs alleged to have
been neglected were serious (the objective element).  Monmouth
County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326,
346 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

The legal malice required to satisfy the subjective component
of an Eighth Amendment claim is not present unless the defendant's
conduct involved "unnecessary and wanton infliction of pain".
Id., citing Whitley v. Albers, 475 U.S. 312, 319 (1985).  See
Ingraham v. Wright, 430 U.S. 651, 670 (1977); Gregg v. Georgia,
428 U.S. 153, 173 (1976).  Wantonness "does not have a fixed
meaning but must be determined with 'due regard for differences in
the kind of conduct against which an Eighth Amendment objection is
lodged.'"  Wilson, 501 U.S. at 302, quoting Whitley, 475 U.S. at
320.  With regard to medical care, only egregious acts or
omissions can violate this standard.  Mere medical malpractice can
not result in an Eighth Amendment violation, nor can disagreements
over a prison physician's medical judgment.  White v. Napoleon,
897 F.2d 103, 108-10 (3d Cir. 1990).  Furthermore, a complaint
that a physician or a medical department "has been negligent in
diagnosing or treating a medical condition does not state a valid
claim of medical mistreatment under the Eighth Amendment...."
Estelle v. Gamble, 429 U.S. 97, 106 (1976).

The objective component of an Eighth Amendment claim, i.e.,
whether a plaintiff's medical needs were serious, has its roots in
contemporary standards of decency. Hudson v. McMillian, 503 U.S.

4

1, 9 (1992). A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. <u>Johnson v. Busby</u>, 953 F.2d 349, 351 (8th Cir. 1991); <u>Monmouth County Correctional Institution Inmates v. Lanzaro</u>, 834 F.2d at 347; <u>Ramos v. Lamm</u>, 639 F.2d 559, 575 (10th Cir. 1980), <u>cert. denied</u>, 450 U.S. 1041 (1981); <u>West v. Keve</u>, 571 F.2d 158, 162-63 n.6 (3d Cir. 1978). The serious medical need element contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain. <u>See</u> <u>Monmouth County Correctional Institution Inmates v. Lanzaro</u>, 834 F.2d at 347; <u>Archer v. Dutcher</u>, 733 F.2d 14, 16-17 (2d Cir. 1984); <u>Todaro v. Ward</u>, 565 F.2d 48, 52 (2d Cir. 1977). Not every injury or illness invokes constitutional protection -- only those that are serious have that effect.

The types of conditions which have been held to meet the constitutional standard of serious medical need include a brain tumor, <u>Nietzke v. Williams</u>, 490 U.S. 3 (1989); broken hip, <u>Hathaway v. Coughlin</u>, 841 F.2d 48 (2d Cir. 1988); premature return to prison after surgery, <u>Kelsey v. Ewing</u>, 652 F.2d 4 (8th Cir. 1981); diabetes requiring special diet, <u>Johnson v. Harris</u>, 479 F.Supp. 333 (S.D. N.Y. 1979); a bleeding ulcer, <u>Massey v. Hutto</u>, 545 F.2d 45 (8th Cir. 1976); loss of an ear, <u>Williams v. Vincent</u>, 508 F.2d 541 (2d Cir. 1974); paralyzed inmate who has a need for a wheelchair, <u>Weeks v. Chaboudy</u>, 984 F.2d 185 (6th Cir. 1993);

suicidal behav.     Parker v.     and Unknown Police Officers of

City of Houston,            F.        1145  5t   Cir.  1985 ; and coronary

artery disease, Brewer v. Blackwell,  836 F.Supp. 631 (S.D. Iowa

1993).

   In contrast several conditions have been found not to be

serious in the constitutional sense, such as cold symptoms, Gibson

v. McEvers, 631 f.2d 95 (7th Cir. 1980); headaches, Dickson v.

Colman, 569 F.2d 1310 (5th Cir. 1978); a broken finger, Rodriguez

v. Joyce, 693 F.Supp. 1250 (D.Me. 1988); toothache and cut, Tyl

v. Rapone, 603 F.Supp. 268 (E.D. PA. 1985); "bowel problems",

Glasper v. Wilson, 559 F.Supp. 13 (W.D. N.Y. 1982); and a skin

rash, acne and flu, Ware v. Fairman, 884 F.Supp. 1201, 1206 (N.D.

Ill. 1995).

   Branch contends that while an inmate at SCI-Waymart he

developed a rash on his back and foot.  A doctor unidentified in

the complaint, but presumably Dr. Homily, examined him and

prescribed a cream, Nolizone.  Branch alleges that he applied the

cream to the affected areas and that the cream did help.

Subsequently, the doctor withdrew the use of Nolizone because

Branch had used it to long and prescribed Lotrizone cream which

cleared up the rash.  However, Branch alleges that he developed

serious side effects from using the Lotrizone cream, including the

development of female breasts and other unidentified traits.

Branch alleges that he stopped using the medication, the rash

reappeared and he went to sick call and Dr. Homily told him to

scratch the rash. Branch and is this constituted medical malpractice. Branch also includes in what he terms his malpractice claim against Dr. Homily a claim that Dr. Homily refused to allow inmates to take time off from work when they became ill. Branch claims that he was suffering from a cold for a long time because his job requires him to go in and out of a freezer, that he asked Fabricatore if he could return to his cell block because he was sick and Fabricatore refused to allow him to go back to his cell. However there is no indication in the complaint that Dr. Homily knew about this incident or that Branch ever informed him of it at anytime.

With regard to Branch's claims relating to his cold and rash, it is clear that the complaint fails to state a claim because those conditions cannot be considered serious medical needs. As for Branch's claims relating to the side effects of the Lotrizone cream, assuming without deciding that the adverse reaction to the Lotrizone cream was a serious medical need, there are no allegations from which it could be concluded that Dr. Homily possessed the culpable mental state necessary for Eighth Amendment liability to attach. The only allegation in the complaint that arguably could be considered indicative of deliberate indifference is the allegation that Dr. Homily stated in reference to the rash that Branch should "scratch it." However, because a rash is not a serious medical need that statement is immaterial.

The allegations in to  in  lant deplot nothing more than Branch's subjective disagreemen  with the treatment decisions and medical judgment of Dr. Homily.  At most the allegations in the complaint only rise to the level of mere negligence.  In fact, Branch couches his complaint in terms of negligence and medical malpractice -- "a serious note of malpractice" and "the malpractice claim."  Branch has set forth no allegation in the complaint which suggest that Dr.  mily was deliberately indifferent to his serious medic..  needs by failing to furnish more or different treatment.  Accordingly, Dr. Homily is entitled to dismissal of Branch's claims which at best amount to a disagreement with the professional judgment exercised by Dr. Homily.

The court observes, however, that Branch has alleged that he suffered an adverse reaction from the Lotrizone cream and it appears from his brief in opposition that he may be contending that Dr. Homily failed to provide him  ith adequate medical care for that adver. reaction.  Furthermore, in his brief in opposition Branch claims that he has high blood pressure, Dr. Homily knew he had high blood pressure and Dr. Homily failed to provide him with adequate medical care for that condition and failed to relieve him of his (or) assignment.  Branch also in his brief in opposition appears to be contending that the medication that Dr. Homily prescribed him raised his blood pressure and that Dr. Homily took no corrective action.  Therefore, the court will

8

grant Branch an opportunity to __ an amended complaint
addressing those claims within twenty (20) days of the date of
this order.

Branch is advised that any amended complaint must be complete
in all respects, _i.e._, it must be a new pleading which stands by
itself as an adequate complaint without reference to the complaint
already filed or other documents in the record.  It should not
contain conclusory allegations; rather, the amended complaint
should establish the existence of actions by Dr. Homily which have
resulted in constitutional deprivations.  See Rizzo v. Goode, 423
U.S. 362 (1976).  The amended complaint should also be "simple,
concise, and direct" as required by the Federal Rules of Civil
Procedure.  See Fed.R.Civ.P. 3(e)(1).

Accordingly, IT IS HEREBY ORDERED THAT:

1.    Branch is granted leave to file an amended complaint
against Dr. Homily, consistent with the foregoing memorandum,
within twenty (20) days of the date hereof

2.    If Branch files an amended complaint, consistent with the
foregoing memorandum, Dr. Homily's motion to dismiss the complaint
will be denied as moot.

3.    If Branch fails to file an amended complaint within
twenty (20) days of the date hereof, Dr. Homily's motion to

dismiss the complaint will be granted.

SYLVIA H. RAMBO, Chief Judge
Middle District of Pennsylvania

Dated:   January 30, 1996

SR:gs