IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

William Branch,            :
      Plaintiff       :
                      :    No. 1:CV 00-1728
     v.              :
                      :    (Judge Conner)
CO Russian, et al.      :
      Defendants   :
                      :    ELECTRONICALLY FILED

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## STATEMENT OF THE CASE

**Nature of the Case and Parties**

This is a civil rights action by a state prisoner alleging, *inter alia*, retaliation, denial of due process, and interference with the practice of his religion by prison officials.

Plaintiff is William Branch, a prisoner confined at the State Correctional Institution at Waymart("SCI-Waymart"). Branch has been granted *in forma pauperis* status and is proceeding *pro se.*

Defendants are the former Secretary of the Department of Corrections, Martin Horn, and a number of present and former employees of the Department: Raymond Colleran, SCI-Waymart Superintendent; Kim Griffiths; Wayne Gavin; Timothy Welling; William Gagas; Milton Freidman; Elaine Martin; Ronald

Richards, Christopher Jones; Martin Walsh;  Christina Wilbur; David Gorman;

Joseph Scalzo; Neil Heffernan; Carol Surace; Edward Burke; Emanual Patterson;

Julie Suchy and Richard Russian.

The complaint is said to be premised upon the First,  Eighth and Fourteenth

Amendments and is brought pursuant to 42 U.S.C . § 1983.  The complaint

requests injunctive relief and damages.  A jury trial has also been requested.

**Relevant Procedural History**

Defendants are today moving for summary judgment in the favor on all

Branch's claims.  This is their supporting brief.

**Facts**

In  2000, William Branch was employed in the kitchen at the State

Correctional Institution at Waymart( "SCI-Waymart") under the supervision of

Julie Suchy. *See* Suchy Declaration, ¶ 2.   In February of  2000, Ms. Suchy

directed Branch to take the garbage out and he agreed to do so. *Id.,* at *¶3* .  After

giving that direction,  Ms. Suchy observed another prisoner who worked in the

kitchen returning from taking the garbage out. *Id.,*  at ¶ 4.  Ms. Suchy asked

Branch if he had done as he had been directed and he admitted that he had not.

*Id.,* at ¶ 5.  Branch told Ms. Suchy that there had been so much to do that he had

asked the other inmate to take the garbage out. *Id.*   Suchy issued a  misconduct

2

to Branch for refusing to obey an order and for lying to staff. *Id.,* at ¶6. The charges in the misconduct issued by Suchy to Branch were true. *Id.,* at ¶ 9.

Branch was given a hearing on the misconduct and presented his version at the hearing. *See* Suchy Declaration, ¶ 7. Branch was found guilty on the misconduct, given a 15 day cell restriction and removed from his kitchen job. *Id.,* at ¶ 8.

In 2000, while housed on M-2 Block, Branch got into a disagreement with Officer Russian. Officer Russian worked on M-2 Block for a time while Branch was housed there. *See* Russian Declaration, ¶ 2. One of Officer Russian's responsibilities on M-2 was to perform safety and security checks of the areas in which prisoners are housed. *Id.,* at ¶3. A safety and security check is not a search. *Id.,* at ¶4. Safety and security checks are checks of the electrical outlets, integrity of the bars, screens, lighting fixtures, bed and cabinets to make certain that the cells, cell components and the areas around the cells are secure and in good working order. *Id.* Officer Russian performed six safety and security checks per shift that he worked. Safety and security checks are performed on each prisoner area every ten days. *Id.,* ¶ 5.

Officer Russian performed safety and security checks on Branch's cell area many times during the course of his assignment on M-2. *See* Russian

3

Declaration, ¶ 6.   In conducting safety and security checks, Officer Russian treated Branch that same way that he treated all the other prisoners housed on M-2. *Id.*

On one occasion, when Officer Russian was conducting a safety and security check on Branch's cell area,  Branch sought to interfere with the officer's inspection of the cabinet in his cell. *See* Russian Declaration, ¶ 7.  Branch became defiant and argumentative and told Russian that he did not have the authority to look inside the cabinet as part of the check.  *Id.,* at ¶ 8.  Officer Russian disagreed with Branch and continued with the check because he believed Branch to be wrong. *Id.*

Officer Russian issued misconducts to Branch for a number of infractions, including refusing to get haircuts and making threats. *See* Russian Declaration, ¶ 9.  Branch filed official grievance number WAM-0232-00 addressed to Superintendent Colleran complaining about Officer Russian's safety and security check. *See* Friedman Declaration, ¶ 3.  The grievance was assigned to Milt Friedman, the Unit Manager for the unit on which Branch was housed. *Id. ,*at ¶ 4.  Milt Friedman investigated Branch's grievance by reviewing Department of Corrections Administrative Directive 203 which governs safety and security inspections and by speaking to Branch and Officer Russian. *Id.,* at ¶ 6.

Branch became loud and argumentative when speaking to Friedman, so Friedman warned that Branch would be moved from the "side room" where he was housed and transferred to the open dormitory if he could not control himself. Friedman Declaration, ¶ 7. Friedman later responded in writing to Branch's grievance stating that Officer Russian's safety and security check of his cell area, including the inside of his cabinet, had been properly conducted. *Id.,* at ¶8. In responding to Branch's grievance and in dealing with him, Friedman treated him the same as he treated all other prisoners. *Id.,* at ¶ 9.

Branch receives treatment at SCI-Waymart for diabetes and hypertension. *See* Fiske Declaration, ¶ 4. Branch was on a 2000 calorie diet during 1998, through 1999 and during parts of 2000. *Id.,* at ¶5. Defendant Neil Heffernan, fomerly employed at SCI-Waymart as a Physician's Assistant, increased Branch's caloric intake from 2000 calories on July 17, 2000 at Branch's request. *Id.,* at ¶ 6. Branch's calories were reduced from 2500 calories to 2000 calories on July 30, 2000 and, after Branch complained, were changed back to 2500 calories on August 9, 2000. *Id.,* at ¶ 7.

Changes in a diabetic prisoner's caloric intake are made with reference to his blood sugar test results. Fiske Declaration, ¶ 8. These changes are not made randomly or for punitive reasons. *Id.* There is no indication that the changes in

5

Branch's caloric intake caused any adverse effect to his health or well-being. *Id.,* at ¶ 9. Medical staff members have no involvement in the preparation or service of food trays to prisoners. *Id.,* at ¶10.

While housed on F Block, Branch became dissatisfied with his housing assignment. Branch complained to Elaine Martin, the Unit Manager at the time, that another prisoner was not allowing him to practice his religion and she authorized his move from a top bunk in Cube #1 to a top bunk in Cube #4. *See* Karwowski Declaration, ¶¶ 5-6.

Branch did not like his top bunk in Cube #4 and complained that he had a medical condition that required him to be assigned to a bottom bunk. Karwowski Declaration, ¶7. The prison Medical Department acquiesced and granted Branch "bottom bunk" status. *Id.* Upon verification of his "bottom bunk" status, Ms. Martin directed that Branch be moved again to a bottom bunk in Cube #4. *Id.,* at ¶ 8. After being moved to a bottom bunk in Cube #4, Branch complained that he was near a window and requested another change. *Id.,* at ¶ 9. Branch was next moved to Cube #2 which had no window. *Id.,* at ¶ 10. Branch did not like Cube #2 because he was near a fan and requested another move. *Id.,* at. ¶11.

Officer Karwowski never received any information from the medical department or elsewhere informing him that Branch could not sit upright during

6

cell count or that Branch was excused from sitting upright during cell count. Karwowski Declaration, ¶ 16.

Inmate grooming is governed by Department of Corrections Administrative Directive ("DC-ADM ") 807. *See* Gagas Declaration,¶ 4.  The term "grooming" encompasses the cutting of hair on the face and head among other things. *Id.*, ¶3. DC-ADM 807  provides that prisoners are not permitted to have which falls below the top of their collars. *See* Gavin Declaration,¶ 4.  Prisoners who refuse to comply with 807's hair length requirement are subject to disciplinary action. *Id.,* at ¶ 5.

On July 22, 1997, DC-ADM 807 was amended to include DC-ADM 807-3 which governs haircut exemptions on the basis of religious conviction.  Gagas Declaration ,¶ 5. The directive was amended to provide a process by which those inmates  with sincerely held religious beliefs could seek an exemption to the hair grooming policy for legitimate religious reasons. *Id.,* at ¶ 6.   To obtain an exemption from DC-ADM 807 on religious grounds, a prisoner must submit a written request to the Facility Chaplaincy Director and receive written approval. *See* Gavin Declaration , at ¶ 6.

It was the Department's policy upon receiving an inmate's request for an 807 exemption to require the inmate to provide in addition to that request a letter

7

or other certification from his outside faith group which verifies that he was known by the head of his religious faith while on the street and had a history of participating in his claimed religion before his incarceration. Gagas Declaration, ¶ 7. The requirement that inmates provide evidence of outside religious participation was included to aid in the differentiation by prison administrators of inmates' *bona fide* religious claims from those put forth by inmates for reasons other than religious beliefs. *Id.,* ¶ 8.

Branch discussed with Chaplain Gagas his request for a haircut exemption. Gagas Declaration, ¶ 11. At the time of his request, Branch claimed to be a Nazarite, a faith group which has no requirement that its members refrain from cutting their hair. *Id.* Chaplain Gagas denied Branch's request for a haircut exemption because his assertion that Nazarite followers refrain from cutting their hair has no basis in the Bible. *Id.* Branch never provided a letter, certification or any documentation from any faith group which verifies that not cutting his hair is a required precept of his faith. *Id.,* at ¶12.

Under educational policies in effect at SCI-Waymart, a prisoner who is participating in a school program may request and be excused from attending class for certain events, including medical appointments, haircuts and certain religious events. *See* Walsh Declaration, ¶ 3. For a religious event to be approved as an

8

"excused absence" from school, it must be considered a required part of a religious service. *Id.,* at ¶ 4. Choir practice has never been viewed as a required part of a religious service and is not, therefore, an event which can be approved as an excused absence. *Id.,* at ¶ 5. Attendance at choir practice is wholly voluntary on the part of its participants. *Id.*

Nevertheless, a prisoner attending school is allowed three unexcused absences from class per semester. Walsh Declaration, ¶ 6. A prisoner enrolled in a school program who receives a fourth unexcused absence in a semester is dropped from the class. *Id.*

In 2001, Branch was enrolled in night school and was taught by Ms. Wilbur. Night school was held on two evenings each week. Walsh Declaration, ¶ 7. Requests by Branch and other prisoners for excused absences to attend choir practices held during an evening when night school was held were not approved. *Id.,* at 9. Branch's request for an excused absence from class was not treated differently than those of other prisoners. *Id.,* at ¶10.

### STATEMENT OF THE ISSUES PRESENTED

1.  Whether summary judgment should be entered in favor of defendants Ronald Richards and Joseph Scalzo because allegations against them were not included in the body of the complaint?

2.  Whether summary judgment should be entered in favor of defendants

Horn, Gorman, Griffiths, Martin, Burke and Patterson because there are no allegations in the complaint which describe violations of federal law ?

3.    Whether summary judgment should be entered in favor of defendant Surace because the claim against her is barred by the statute of limitations?

4.    Whether summary judgement should be entered in favor of defendants Colleran, Friedman and Jones because Branch's hearings did not violate of due process?

5.    Whether summary judgment should be entered in favor of defendant Heffernan because there are no facts showing a deliberate indifference to a serious medical need?

6.    Whether summary judgment should be entered in defendants' favor because there are no facts showing retaliation against Branch for engaging in protected activity?

10

**ARGUMENT**

I.    SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF
      DEFENDANTS RICHARDS AND SCALZO BECAUSE
      ALLEGATIONS AGAINST THEM  WERE NOT INCLUDED IN
      THE BODY OF THE COMPLAINT.

Branch seeks to impose liability upon defendants  Ronald Richards and

Joseph Scalzo  pursuant to § 1983.  However, he failed to make them proper

parties to the lawsuit.  This failure is a fatal defect.

In determining whether a party is named properly in a complaint, courts are

not bound by the caption.  *Yeseta v. Baima,* 837 F.2d 380, 382-83 (9th Cir. 1988).

In general, the allegations in the body of a complaint, not the names in a caption,

determine the parties to a lawsuit.  *Greenwood v. Ross,* 778 F.2d 448 452 (8th Cir.

1985).  In this case, Branch included in the caption of the case the names of

Ronald Richards and Joseph Scalzo among the numerous other names.   However,

he made no mention of these two individuals and included no information in the

body of the complaint which permits their identification or affords notice of the

unlawful actions they are said to have committed.  Because of this,  Branch's

complaint fails in the literal sense to state a claim against Ronald Richards and

Joseph Scalzo  and summary judgment should therefore be entered in their favor.

II.     SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF
        DEFENDANTS HORN, GORMAN, GRIFFITHS, MARTIN,
        BURKE AND PATTERSON BECAUSE THERE ARE NO
        ALLEGATIONS WHICH DESCRIBE VIOLATIONS OF FEDERAL
        LAW BY THEM.

Liability under § 1983 may only be based upon a state actor's involvement

in conduct which violates a plaintiff's federally protected rights. *Hampton v.*

*Holmesburg Prison Officials,* 546 F. 2d 1077, 1082 (3d Cir. 1976).  To state a

claim, the complaint must contain allegations that the defendant actually

participated in or had actual knowledge of and acquiesced in actions proscribed by

federal law.  *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988).  Liability

cannot be imposed on the basis of *respondeat superior* or the position of the state

actor. *Parratt v. Taylor,* 451 U.S. 527, 537 n.3(1981).

In his complaint, amidst averments concerning defendant Russian's

allegedly unlawful "searches" of his cell,  Branch stated  that he "spoke to the

psychologist,  Mr. Gorman".  Complaint, p. 3,¶ 3.  Branch also stated that he

"notified" defendant Griffiths concerning Russian's actions.  Complaint, p.3,¶ 3.

Federal law does not requires action on the part of state actors under these

circumstances.

When describing  his efforts to be moved from one housing situation he

believed to be hostile to another one,  Branch claimed that "after approaching

12

[defendant] Martin, with my intentions to seek legal redress, I was moved." Complaint, p. 5,¶ 1. Based upon his own statement, Ms. Martin did what he asked her to do. There is no need for federal law which prohibits such conduct.

When attempting to describe how he had been impermissibly denied a religious exemption from the prison's haircut requirement, Branch alleged, "The next day I spoke to Mr. Burke who said I had a 'no win' [sic]". Complaint, p. 6, ¶. 1. And with respect to defendant Patterson, Branch claimed that he "spoke with Lt. Patterson who advised me to get my hair cut, then contest the exemption policy later." Complaint, p. 6, ¶ 1. Absent allegations that show that Burke and Patterson actually interfered with Branch's exercise of his religion, their statements to him are not a sufficient basis upon which to impose liability under §1983 upon them.

Finally, Branch's allegations concerning defendant Horn are as follows:

"As the Secretary of the DOC, Mr. Horn,[sic] is directly responsible for the actions of all those under him, and ultimately responsible for the conspiratorial acts of harassment that hindered and frustrated my efforts to access the courts and violated my constitutional rights. as he also is a defendant in my civil suit now stayed in the Third Circuit appeal court[sic]"

Complaint, p. 7., ¶ 3. These statements concerning defendant Horn constitute an attempt by Branch to impose liability upon him for the actions of his subordinates.

13

*Respondeat superior* liability is not available under [section sign] 1983.

Because the claims asserted against these six individuals do not constitute conduct which violates the federal constitution or federal law, Branch failed to state a claim against them under § 1983. The Court should grant summary judgment in favor of defendants Horn, Gorman, Griffiths, Martin, Burke and Patterson.

III.    SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANT SURACE BECAUSE THE CLAIM AGAINST HER IS BARRED BY THE STATUTE OF LIMITATIONS

There is no specific statute of limitations for actions brought pursuant to 42 U.S.C. §1983. However, the Supreme Court has held that the statute of limitations for a §1983 claim is the state statute of limitations for personal injury actions which, in Pennsylvania, is two (2) years. *Cito v. Bridgewater Twp Police Dept.*, 892 F.2d 23, 25 (3d Cir. 1989), *citing Wilson v. Garcia,* 471 U.S. 261 (1985); *Smith v. City of Pittsburgh,* 764 F.2d 188 (3d Cir. 1985); 42 Pa.C.S.A. §5524. Therefore, any potential claims which accrued before July 20, 1999, are barred by the statute of limitations.

A cause of action accrues in a federal case as soon as a potential plaintiff knows or has reason to know of the injury which is the basis of the claim. *Keystone Insurance Co. v. Houghton,* 863 F.2d 1125, 1127 (3d Cir. 1988);

14

*Mitchell v. Hendricks,* 431 F.Supp. 1295 (E.D.Pa. 1977). With respect to any §1983 claim against defendant Carol Surace, that claim clearly accrued when she allegedly "wrote [him] up" on false charges while he was employed in the Garment Plant. *See* Complaint, p. 7, ¶1 According to Ms. Surace, Branch was last employed in the Garment Plant in October of 1997. *See* Declaration of Carol Surace, ¶8. At the latest, Branch's cause of action against accrued on October 10, 1997 when he received the misconduct from defendant Surace.

Since any §1983 claim Branch may have had against Defendant Carol Surace accrued more than two (2) years before he filed his complaint, this claim is barred by the statute of limitations. Accordingly, summary judgment should be entered in her favor.

IV.    SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF
       DEFENDANTS COLLERAN, FRIEDMAN AND JONES
       BECAUSE BRANCH'S HEARINGS DID NOT VIOLATE DUE
       PROCESS.

Branch alleged that he was charged with misconducts that he did not deserve and confined in the prison's Restricted Housing Unit. He also alleged that his statements were not properly credited and recorded in the documentation on the hearing. It is apparently Branch's intention to challenge the procedures he was afforded on those misconducts as denials of due process and to charge defendants

15

Colleran, Friedman and Jones with these due process violations. However, Branch has no viable due process claims.

In *Sandin v. Conner,* 515 U.S. 472(1995), a prisoner was charged with multiple disciplinary infractions  the prison's refusal to allow him certain witnesses at his hearing.  After being found guilty of the misconducts and sentenced to 30 days in segregated confinement,  the prisoner challenged the hearing procedures on due process grounds.  The United States Supreme Court in *Sandin* disagreed and held  that confinement in punitive segregation will rarely be enough, without more, to establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest.  515 U.S. at 475-76.  Branch likewise has not presented facts in his complaint against Colleran, Friedman and Jones which show  an "atypical" deprivation of prison life which triggers due process protection.  These three defendants are therefore entitled to summary judgment on Branch's due process claims.

> V.    SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF
>        DEFENDANT HEFFERNAN  BECAUSE THERE ARE NO FACTS
>        SHOWING A DELIBERATE INDIFFERENCE TO A SERIOUS
>        MEDICAL NEED.

To state an eighth amendment claim in the context of prison medical care, the prisoner must allege that the defendants was deliberately indifferent to a

serious medical need or caused the unnecessary and wanton infliction of pain.

*Estelle v. Gamble,* 429 U.S. 97 (1976)   A medical need may be considered serious

if it is "one that has been diagnosed by a physician as requiring treatment or one

that is so obvious that a lay person would easily recognize the neccesity for a

doctor's attention."  *Monmouth County Correctional Institution Inmates v.*

*Lanzaro,* 834 F.2d 326, 347(3d Cir. 1987)

   "Mere medical malpractice cannot give rise to a violation of the Eighth

Amendment."  *White v. Naploeon,* 897 F. 2d 103, 108(3d Cir. 1990)   Nor can a

prisoner establish an eighth amendment by showing his disagreement with a

medical practitioner's course of treatment. *Young v. Quinlan,* 960 F.2d 351, 358

n.18 (3d Cir. 1992)

   Branch claims that defendant Heffernan violated his rights under the eighth

amendment by reducing his caloric intake for a time in 2001 thereby "jeopardizing

his health safety and well-being". Complaint, p.4, ¶ 2. However,  Branch cannot

establish that the reduction constituted deliberate indifference to a serious medical

need. As the declaration of Mr. Fiske establishes, changes in the caloric intake of

diabetic prisoners like Branch were made with reference to the results of blood

sugar tests. *See* Fiske Declaration, ¶ 8.   The reduction of Branch's caloric intake

in 2001 lasted only ten days and had no adverse effect on his health and well-

17

being. *Id.* ¶¶ 7,9.   Branch's eighth amendment claim against Heffernan has no

merit.

VI.    SUMMARY JUDGMENT SHOULD BE ENTERED IN
       DEFENDANTS' FAVOR BECAUSE THERE ARE NO FACTS
       SHOWING RETALIATION AGAINST BRANCH FOR
       ENGAGING IN PROTECTED ACTIVITY .

A prisoner alleging that prison officials have retaliated against him for

exercising his constitutional rights must prove that: 1) the conduct in which he

was engaged was constitutionally protected; 2) he suffered "adverse action" at the

hands of prison officials; and 3) his constitutionally protected conduct was a

substantial or motivating factor in the decision to discipline him. *Rauser v. Horn*,

241 F.3d 330, 333 (3d Cir. 2001)(adopting *Mount Healthy Bd. of Educ. v. Doyle*,

429 U.S. 274, 287 (1977)).   Once a prisoner has made his *prima facie* case, the

burden shifts to the defendant to prove by a preponderance of the evidence that it

"would have made the same decision absent the protected conduct for reasons

reasonably related to penological interest." *Rauser*, 241 F.3d at 334 (incorporating

*Turner v. Safley*, 482 U.S. 78, 89 (1987)).

As the Third Circuit recognized in *Carter v. McGrady*, 292 F.3d 152, 158

(3d Cir. 2002), the Supreme Court has stated that decisions of prison

administrators are entitled to great deference.  In crafting the appropriate standard

18

of review for prisoners' constitutional claims, the Court observed that "[r]unning a prison is an inordinately difficult undertaking." *Turner*, 482 U.S. at 85. Moreover, the Court noted that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform" Id. (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). Thus, "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

Here, defendants do not dispute that Branch can satisfy the first and second prongs of the *Rauser* criteria with respect to defendants Russian, Surace, Gagas, Gavin, Walsh and Wilbur.  Courts have recognized that filing lawsuits and grievances are protected activities under the First Amendment. See e.g. *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000); *Allah v. Al-Hafeez*, 208 F.Supp. 2d 520, 535 (E.D. Pa. 2002); *Hill v. Blum*, 916 F.Supp. 470, 473-74 (E.D. Pa. 1996). Similarly, subjecting Branch to the search of his cell, charging him with misconducts and interfering with the exercise of his religion for no legitimate reasons constitute  adverse actions. *See e.g. Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002)(misconduct report in retaliation for an inmate's resort to legal

19

process in a violation of First Amendment).

Branch, however, cannot establish a causal link between his protected activities and the adverse actions he claims occurred as a consequence of them. As the declaration of defendant Russian makes clear, the safety and security checks he conducted on Branch's cell, its component parts and the areas around the cell serve important security objectives. These checks are undertaken to ensure that cell bars, electrical outlets, screens, lighting fixtures and the like are secure and in good working order. Russian Declaration, ¶ 4. Issuing misconducts and denying the requests for haircut exemptions and " excused absences" to prisoners who refuse to act in accordance with prison rules and with the orders given to them by staff promote discipline, internal order and security. *See* Gagas Declaration, ¶¶13-14; Gavin Declaration, ¶ 8; Walsh Declaration, ¶¶ 4-5,9-10; Wilbur Declaration, ¶¶ 3-5; Surace Declaration, ¶¶ 5-7, 9-10.

Clearly, there are legitimate penological reasons for the actions taken by defendants Russian, Gagas, Gavin, Walsh, Wilbur and Surace and their statements made under penalty of perjury establishes that those were the reasons for their actions. Because Branch has no evidence which shows they would not have acted as they did absent his protected activities, he cannot make out a retaliation claim against them. The Court should therefore grant summary judgment in favor of

defendants Russian, Gagas, Gavin, Walsh Wilbur and Surace on Branch's retaliation claims.

## CONCLUSION

For all the foregoing reasons, the Court should grant defendants' motion and enter summary judgment in their favor on all Branch's claims.

Respectfully submitted,

GERALD J. PAPPERT
Acting Attorney General

By:    S/GWENDOLYN T. MOSLEY
GWENDOLYN T. MOSLEY
Senior Deputy Attorney General

SUSAN J. FORNEY
Chief Deputy Attorney General
Chief, Litigation Section

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **William Branch,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:CV 00-1728** |
| **v.** | : | |
| | : | **(Judge Conner)** |
| **CO Russian, et al.** | : | |
| **Defendants** | : | |
| | : | **ELECTRONICALLY FILED** |

**CERTIFICATE OF SERVICE**

I, **GWENDOLYN T. MOSLEY,** Senior Deputy Attorney General

for the Commonwealth of Pennsylvania, Office of Attorney General, hereby

certify that on **December 31, 2003,** I caused to be served a true and correct copy

of the foregoing **Defendants' Brief in Support of their Motion for Summary**

**Judgment** by depositing it in the United States mail, first-class postage prepaid to

the following:

William Branch, #CF-3756
SCI-Waymart
P.O. Box 256
Waymart, PA  18472

S/GWENDOLYN T. MOSLEY
GWENDOLYN  T. MOSLEY
Senior Deputy Attorney General

22