IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **William Branch** | : | |
| **Plaintiff** | : | |
| | : | No. 1:CV 01-1728 |
| v. | : | |
| | : | (Judge Rambo) |
| **CO Russian, et al.** | : | |
| **Defendants** | : | ELECTRONICALLY FILED |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendants, by their attorneys, hereby state pursuant to L.R.M.D. 56.1 that the following are facts as to which there is no material dispute:

1. In the year 2000, William Branch was employed in the kitchen at the State Correctional Institution at Waymart ("SCI-Waymart") under the supervision of Julie Suchy.

2. In February of 2000, Ms. Suchy directed Branch to take the garbage out and he agreed to do so.

3. After giving that direction, Ms. Suchy observed another prisoner who worked in the kitchen returning from taking the garbage out.

4. Ms. Suchy asked Branch if he had done as he had been directed and he admitted that he had not.

5. Branch told Ms. Suchy that there had been so much to do that he had asked the other inmate to take the garbage out.

6. Ms. Suchy issued a misconduct to Branch for refusing to obey an order and for lying to staff.

7. Branch was given a hearing on the misconduct and presented his version at the hearing.

8. Branch was found guilty, given a 15 day cell restriction and removed from his kitchen job.

9. In 2000, while housed on M-2 Block, Branch got into a disagreement with Officer Russian.

10. Officer Russian worked on M-2 Block for a time while Branch was housed there.

11. One of Officer Russian's responsibilities on M-2 was to perform safety and security checks of the areas in which prisoners are housed.

12. A safety and security check is not a search. Safety and security checks are checks of the electrical outlets, integrity of the bars, screens, lighting fixtures, bed and cabinets to make certain that the cells, cell components and the areas around the cells are secure and in good working order.

13. Officer Russian performed six safety and security checks per shift that he worked.

14. Safety and security checks are performed on each prisoner area every ten

days.

15. Officer Russian performed safety and security checks on Branch's cell area many times during the course of his assignment on M-2.

16. In conducting safety and security checks, Officer Russian treated Branch that same way that he treated all the other prisoners housed on M-2.

17. On one occasion, when Officer Russian was conducting a safety and security check on Branch's cell area, Branch sought to interfere with the officer's inspection of the cabinet in Branch's cell.

18. Branch became defiant and argumentative and told the officer that he did not have the authority to look inside the cabinet as part of his check.

19. Officer Russian disagreed with Branch and continued with the check because he believed Branch to be wrong.

20. Officer Russian issued misconducts to Branch for a number of infractions, including refusing to get haircuts and making threats.

21. Branch filed official grievance number WAM-0232-00 addressed to Superintendent Colleran complaining about Officer Russian's safety and security check.

22. Branch's grievance number WAM-0232-00 was assigned to Milt Friedman, the Unit Manager for the unit on which Branch was housed.

23.   Milt Friedman investigated Branch's grievance by reviewing Department of Corrections Administrative Directive 203 which governs safety and security inspections and by speaking to Branch and Officer Russian.

24.   Branch became loud and argumentative when speaking to Friedman, so Friedman warned that he would be moved from the "side room" where he was housed and transferred to the open dormitory if he could not control himself.

25.   Friedman responded in writing to Branch's grievance stating that Officer Russian's safety and security check of his cell area, including the inside of his cabinet, had been properly conducted.

26.   Branch receives treatment at SCI-Waymart for diabetes and hypertension.

27.   Branch was on a 2000 calorie diet during 1998, through 1999 and during parts of 2001.

28.   Defendant Neil Heffernan, formerly employed at SCI-Waymart as a Physician's Assistant, increased Branch's caloric intake from 2000 calories on July 17, 2000 at Branch's request.

29.   Branch's calories were reduced from 2500 calories to 2000 calories on July 30, 2000 and, after Branch complained, were changed back to 2500 calories on August 9, 2000.

30. Changes in a diabetic prisoner's caloric intake are made with reference to his blood sugar test results. These changes are not made randomly or for punitive reasons.

31. There is no indication that the changes in Branch's caloric intake caused any adverse effect to his health or well-being.

32. Medical staff members have no involvement in the preparation or service of food trays to prisoners.

33. While housed on F Block, Branch became dissatisfied with his housing assignment.

34. Branch complained to Elaine Martin, the Unit Manager at the time, that another prisoner was not allowing him to practice his religion and she authorized his move from a top bunk in Cube #1 to a top bunk in Cube #4.

35. Branch did not like his top bunk in Cube #4 and complained that he had a medical condition that required him to be assigned to a bottom bunk.

36. The prison Medical Department acquiesced and granted Branch "bottom bunk" status.

37. Upon verification of his "bottom bunk" status, Ms. Martin directed that Branch be moved again to a bottom bunk in Cube #4.

38. After being moved to a bottom bunk in Cube #4, Branch complained that

5

he was near a window and requested another change.

39. Branch was next moved to Cube #2 which had no window.

40. Branch did not like Cube #2 because he was near a fan and requested another move.

41. Officer Karwowski never received any information from the medical department or elsewhere informing him that Branch could not sit upright during cell count or that Branch was excused from sitting upright during cell count.

42. Branch discussed with SCI-Waymart Chaplain Gagas his request for a haircut exemption.

43. At the time of his request, Branch claimed to be a Nazarite.

44. The Nazarites have no requirement that its members refrain from cutting their hair.

45. Effective July 18, 1994, inmate grooming is governed by Department of Correction Administrative Directive ("DC-ADM") 807.

46. The term "grooming" encompasses the cutting of hair on the face and head among other things.

47. On July 22, 1997, DC-ADM 807 was amended to include DC-ADM 807-3 which governs haircut exemptions on the basis of religious conviction.

48. DC-ADM 807 was amended to provide a process by which those inmates

with sincerely held religious beliefs could seek an exemption to the hair grooming policy for legitimate religious reasons.

49. To obtain an exemption from DC-ADM 807 on religious grounds, a prisoner must submit a written request to the Facility Chaplaincy Director and receive written approval.

50. It was and is the Department's policy upon receiving an inmate's request for an 807 exemption to require the inmate to provide in addition to that request a letter or other certification from his outside faith group which verifies that he was known by the head of his religious faith while on the street and had a history of participating in his claimed religion before his incarceration.

51. The requirement in DC-ADM 807 that inmates provide evidence of outside religious participation was included to aid in the differentiation by prison administrators of inmates' *bona fide* religious claims from those put forth by inmates for reasons other than religious beliefs.

52. Chaplain Gagas denied Branch's request for a haircut exemption based upon his beliefs as a Nazarite because his assertion that Nazarite followers refrain from cutting their hair has no basis in the Bible.

53. The no-cutting-of- the- hair requirement asserted by Branch was based upon his own interpretation of the Bible.

7

7

54. Branch never provided a letter, certification or any documentation from any faith group which verifies that not cutting his hair is a required precept of his faith.

55. Prisoners at SCI-Waymart are given notice of DC-ADM 807 by way of the Inmate Handbook which is given to them at their arrival.

56. DC-ADM 807 provides that hair that falls below the top of the collar shall not be permitted.

57. The directive also states that prisoners who refuse to comply with its hair length provisions are subject to disciplinary action.

58. Enforcement of DC-ADM 807 serves the goals of safety, security and hygiene. Keeping the hair at appropriate lengths prevents prisoners from hiding contraband in the hair, changing their appearance and spreading disease.

59. Under educational policies in effect at SCI-Waymart, a prisoner who is participating in a school program may request and be excused from attending class for certain events, including medical appointments, haircuts and certain religious events.

60. For a religious event to be approved as an excused absence from school, it must be considered a required part of a religious service.

61. Choir practice has never been viewed as a required part of a religious

service and is not, therefore, an event which can be approved as an excused absence. Attendance at choir practice is wholly voluntary on the part of its participants.

62. Nevertheless, a prisoner attending school is allowed three unexcused absences from class per semester. A prisoner enrolled in a school program who receives a fourth unexcused absence in a semester is dropped from the class.

63. In 2001, Branch was enrolled in night school and was taught by Ms. Wilbur.

64. Night school was held on two evenings each week.

65. Requests by Branch and other prisoners for excused absences to attend choir practices held during an evening when night school was held were not approved.

                                                 **Respectfully submitted,**

                                                 **GERALD J. PAPPERT**
                                                 **Acting Attorney General**

                               By:   **S/GWENDOLYN T. MOSLEY**
                                                 **GWENDOLYN T. MOSLEY**
                                                 **Senior Deputy Attorney General**

                                                 **SUSAN J. FORNEY**
                                                 **Chief Deputy Attorney General**
                                                 **Chief, Litigation Section**

**OFFICE OF ATTORNEY GENERAL**
**15th Floor, Strawberry Square**
**Harrisburg, PA   17120**
**717-787-8106**

**DATE: December 31, 2003**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **William Branch** : | |
| Plaintiff : | |
| : | No. 1:CV 00-1728 |
| v. : | |
| : | (Judge Rambo) |
| **CO Russian, et al.** : | |
| Defendants : | |
| : | **ELECTRONICALLY FILED** |

<u>**CERTIFICATE OF SERVICE**</u>

I, **GWENDOLYN T. MOSLEY,** Senior Deputy Attorney General for the Commonwealth of Pennsylvania, Office of Attorney General, hereby certify that on **December 31, 2003**, I caused to be served a true and correct copy of the foregoing document **Defendants' Statement of Undisputed Material Facts,** by depositing it in the United States mail, first-class postage prepaid to the following:

**William Branch, #CF-3756
SCI-Waymart
P.O. Box 256
Waymart, PA  18472**

<u>s/GWENDOLYN T. MOSLEY</u>
**GWENDOLYN T. MOSLEY
Senior Deputy Attorney General**