# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **William Branch** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:CV 00-1728** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **CO Russian, et al.** | : | |
| **Defendants** | : | |
| | : | **ELECTRONICALLY FILED** |

## DOCUMENTS IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Index

Declaration of Julie Suchy                    Appendix A

Declaration of Richard Russian                Appendix B

Declaration of Milton Friedman                Appendix C

Declaration of Donald Fiske                   Appendix D

Declaration of Timothy Welling                Appendix E

Declaration of Barry Karwowski                Appendix F

Declaration of William Gagas                  Appendix G

Declaration of Wayne Gavin                    Appendix H

Declaration of Martin Walsh                   Appendix I

Declaration of Christina Wilbur               Appendix J

Declaration of Carol Surace                   Appendix K

Respectfully submitted,

GERALD J. PAPPERT
Acting Attorney General


By:   s/GWENDOLYN T. MOSLEY
GWENDOLYN T. MOSLEY
Senior Deputy Attorney General

SUSAN J. FORNEY
Chief Deputy Attorney General
Chief, Litigation Section

OFFICE OF ATTORNEY GENERAL
15th Floor, Strawberry Square
Harrisburg, PA    17120
717-787-8106

DATE: December 31, 2003

**Appendix A**

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

William Branch     :
   Plaintiff   :
        :  No. 1:CV 00-1728
 v.      :
        :  (Judge Rambo)
CO Russian, et al.   :
   Defendants  :
        :

## DECLARATION OF JULIE SUCHY

I, Julie Suchy, do hereby state under penalty of perjury that the following is true and correct and based upon my personal knowledge:

1. I am and was for all times relevant to this lawsuit employed by the Department of Corrections at the State Correctional Institution at Waymart ("SCI-Waymart") as a Food Service Instructor.

2. I know plaintiff William Branch because he worked under my supervision in 2000, in the prison kitchen.

3. In February of 2000, while Branch was working in the kitchen, I directed him to take the garbage out and he agreed to do so.

4. However, I later observed another inmate kitchen employee returning to the kitchen with the garbage carts. This other inmate informed me that he was returning from taking the garbage out.

5. I asked Branch if he had done what I directed him to do and he

admitted that he had not taken the garbage out. Branch said that there was so much to do that he had given the other inmate the option of performing another task or taking the garbage out. Branch was not a supervisor and had no authority to assign other prisoners work.

6.    Because Branch had failed to do as I had directed and this occasion was not the first time he had failed to carry out my directions to him , I wrote him up in Misconduct number A191014. I charged him with refusing to obey an order and for lying to staff.

7.    Branch was given a hearing on the misconduct and was afforded the opportunity to present his version at the hearing.

8.    Following the hearing, Branch was given a 15 day cell restriction and was removed from his job in the kitchen.

9.    The charges in the misconduct issued to Branch were true.

Date: ___12/29/03___            _____
                                 **JULIE SUCHY**

2

**Appendix B**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

William Branch            :
      Plaintiff          :
                         :     **No. 1:CV 00-1728**
    v.                  :
                         :     **(Judge Rambo)**
CO Russian, et al.      :
      Defendants    :
                         :

## DECLARATION OF RICHARD RUSSIAN

I, Richard Russian do hereby state under penalty of perjury that the following is true and correct and based upon my personal knowledge:

1.    I am and was for all times relevant to this lawsuit employed by the Department of Corrections at the State Correctional Institution at Waymart ("SCI-Waymart") as a Correction Officer.

2.    I came to know William Branch in the course of performing my duties on M-2 Block at SCI-Waymart where he was housed.

3.    One of my responsibilities on M-2 was to perform safety and security checks of the areas in which prisoners were housed.

4.    A safety and security check is not a search.  Safety and security checks are checks of the electrical outlets, integrity of the bars, screens, lighting fixtures, bed, and cabinets to make certain that the cells, cell components and the areas around the cells are secure and in good working order.

5.     I performed six safety and security checks per shift that I worked. Security and safety checks are performed on each prisoner area every ten days.

6.     I performed safety and security checks on Branch's cell area many times during the course of my assignment on M-2.  In doing so, I treated him the same way that I treated all the other prisoners housed on M-2.

7.     I recall an occasion when I was performing a safety and security check on Branch's area that he sought to interfere with my inspection of the inside of cabinet in his cell.

8.     Branch was defiant and argumentative and said that I did not have the authority to look inside the cabinet.  I disagreed with Branch because he was wrong and proceeded with my inspection.

9.     I have had occasion to issue misconducts to Branch for a number of infractions, including refusing to get haircuts and making threats.

10.     I did not conduct safety and security checks of his cell area or issue misconducts to him to punish him for filing lawsuits and grievances.  I did so as part of my responsibility to maintain the safety and security of the prison and because he was in violation of prison rules.

11.     I did not conduct safety and security checks of Branch's cell area or issue misconducts to him to intimidate him or force him to withdraw his lawsuits.

2

12. I did not harass Branch verbally or otherwise and did not encourage or provoke anyone else to do so.

13. I did not abuse Branch verbally or otherwise and did not encourage or provoke anyone else to do so.

14. I have never taken any action to deprive Branch of state or federal rights.

Date: _12/31/2003_        _[signature]_

RICHARD RUSSIAN

3

**Appendix C**

6.     In investigating the grievance, I reviewed Administrative Directive 203 governing security inspections and spoke to Branch and Officer Russian.

7.     When speaking to Branch, after he became loud and argumentative with his housing officers, I informed him that he would be moved from the side room where he was housed and transferred to the open dormitory if he could not control himself.  This is a standard statement that I use for all prisoners who are disruptive.

8.     On August 17, 2000, I responded in writing to Branch's grievance no. WAM-0232-00.  In the response, I informed Branch that Officer Russian had conducted a safety and security check of Branch's cell area, including the inside of his cabinet, and had acted properly in doing so.

9.     I handled Branch's grievance the same way that  I handled the grievances of other prisoners to which I was assigned.

10.     I reached the conclusion that I did because I saw no evidence of wrongdoing on the part of Officer Russian.

11.     Branch was not moved from the bottom bunk to the top bunk to punish him for filing grievances or lawsuits or for any other improper reason.

12.     I have never taken any action against Branch to deny him rights under state or federal law.

13.     I have never conspired with anyone to deny Branch rights under state or federal law.

2

14.    I have no knowledge that anyone acted to deny Branch rights under state or federal law.

Date: *12/31/03*                MILTON FRIEDMAN

3

**Appendix D**

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

William Branch         :
        Plaintiff       :
                    :     **No. 1:CV 00-1728**
     v.                :
                    :     **(Judge Rambo)**
CO Russian, et al.      :
        Defendants    :
                    :

## DECLARATION OF DONALD FISKE

I, Donald Fiske, do hereby state under penalty of perjury that the following is true and correct and based upon my personal knowledge:

1.     I am and have been since 1990 employed by the Department of Corrections at the State Correctional Institution at Waymart as the Correctional Health Administrator.

2.     In that capacity, I have access to the medical records maintained by the prison concerning the prisoners confined there.

3.     The medical records maintained by the prison concerning William Branch were reviewed.

4.     Branch receives medical treatment for hypertension and diabetes.

5.     Entries in his medical records show that he was on a 2000 calorie diet during 1998, through 1999 and during parts of 2000.

6.    Entries show that former Physician's Assistant Neil Heffernan increased Branch's caloric intake from 2000 calories to 2500 calories on July 17, 2000 at Branch's request.

7.    Branch's calories were reduced from 2500 calories to 2000 calories on July 30, 2000 and, after Branch complained, were changed back to 2500 calories on August 9, 2000.

8.    Changes in a diabetic prisoner's caloric intake are made with reference to his blood sugar test results.  These changes are not made randomly or for punitive reasons.

9.    There is no indication that the changes in Branch's caloric intake caused any adverse effects to his health or well-being.

10.    Medical staff members have no involvement in the preparation or service of food trays to prisoners.

Date: _12/3/63_    _____ CHCI

**DONALD FISKE**

2

**Appendix E**

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

William Branch    :
   Plaintiff   :
        :  No. 1:CV 00-1728
  v.      :
        :  (Judge Rambo)
CO Russian, et al.   :
   Defendants  :
        :

## DECLARATION OF TIMOTHY WELLING

I, Timothy Welling, do hereby state under penalty of perjury that the following is true and correct and based upon my personal knowledge:

1. I am employed by the Pennsylvania Department of Corrections at the State Correctional Institution at Waymart ("SCI-Waymart") as an Acting Captain.

2. At all times relevant to this lawsuit, I was employed at SCI-Waymart as a Lieutenant.

3. I did not deny Mr. Branch access to his legal papers during his confinement in the Restricted Housing Unit ("RHU") or at any other time.

4. I had no knowledge that Mr. Branch was denied access to his legal papers.

5. I did not deny Mr. Branch request slips, envelopes, paper or other materials he needed to file grievances or petition the courts while he was confined in the RHU or at any other time.

6.    I did not come to Mr. Branch's cell, "ball up" a request he made to Superintendent Colleran and throw the request on the floor. I have no knowledge that anyone else did so.

7.    I did not tell Mr. Branch not to try to report me or those under my supervision or threaten retaliation against Branch if he persisted in trying to communicate with Superintendent Colleran.

8.    I have never denied or prevented Branch from receiving the assistance of other prisoners in legal matters.

9.    I have never taken any action to prevent or interfere with Mr. Branch's attempts to communicate with Superintendent Colleran.

10.    I have never tampered with the meals served to Branch.

11.    I have never taken any action to deprive Mr. Branch of rights protected by state or federal laws.

12.    I have never conspired with anyone to deprive Mr. Branch of rights protected by state or federal laws.

Date: _12·31·03_           _____
                                 TIMOTHY WELLING

2

**Appendix F**

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

William Branch         :
         Plaintiff      :
                   :    **No. 1:CV 00-1728**

v.                  :
                   :    **(Judge Rambo)**

CO Russian, et al.      :
        Defendants    :
                   :

## DECLARATION OF BARRY KARWOWSKI

I, Barry Karwowski, do hereby state under penalty of perjury that the following is true and correct and based upon my personal knowledge:

1.     I am and was at all times relevant to this lawsuit employed by the Department of Corrections at the State Correctional Institution at SCI-Waymart ("SCI-Waymart") as a Corrections Officer.

2.     I came to know plaintiff William Branch during the course of my employment at SCI-Waymart while Branch was housed on F Block.

3.     I had no involvement in the decision to house Branch on C Block or on D Block.

4.     I also did not order that Branch be moved to a hostile environment on F Block.

5.     I do recall that when Branch was housed in Cube #1 in a top bunk on F Block he complained to Ms. Martin, the Unit Manager at the time, about an

inmate whom Branch claimed was not allowing him to practice his religion.

6.      In response to Branch's complaint, Ms. Martin authorized his move to Cube #4 to a top bunk.

7.      Branch did not like the top bunk and so complained that he had a medical condition requiring him to be assigned to a bottom bunk.  The medical department acquiesced and granted him "bottom bunk" status.

8.      Upon receiving verification of his "bottom bunk" status from the medical department, Ms. Martin directed that he be moved again.  This time Branch was moved to a lower bunk in Cube #4.

9.      After being moved to a lower bunk in Cube #4, Branch complained that he was near a window and requested another change.

10.     Branch was next moved to Cube #2 which had no window.

11.     After being moved to Cube #2, Branch complained about the fan in the cube and again requested a move.

12.     I did not harass Branch about his bottom bunk status or for any other reason.

13.     I did not encourage or provoke anyone else to harass Branch.

14.     I did not place Branch in a hostile position on F Block or on any other cell block.

2

15.   I have never instructed a correctional officer or anyone else to make entries on the Quarters Card maintained on Branch.

16.   I have never received any information from the medical department or anywhere else which stated that Branch could not sit upright during cell count or which exempted him from sitting upright during cell count.

17.   I have never taken any action to intimidate Branch or punish him for filing lawsuits or grievances.

18.   I have never taken any action to deny Branch access to the courts.


Date: 1-5-04

BARRY KARWOWSKI

3

**Appendix G**

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **William Branch** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:CV 00-1728** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **CO Russian, et al.** | : | |
| **Defendants** | : | |
| | : | |

## <u>DECLARATION OF WILLIAM A. GAGAS</u>

I, William A. Gagas, do hereby state under penalty of perjury that the following is true and correct and based upon my personal knowledge:

1.    I am and was for all times relevant to this lawsuit employed by the Department of Corrections at the State Correctional Institution at Waymart ("SCI-Waymart") as a Chaplain.

2.    As Chaplain, I work at the prison Mondays through Fridays. I also "volunteer" at the prison on Sundays.

3.    As Chaplain, I am familiar with the policies and directives of the Department of Corrections concerning the grooming of inmates. The term "grooming" encompasses the cutting of hair on the face and head among other things. I also have involvement in the process by which prisoners at SCI-Waymart request to be exempted from the Department's grooming directives related to hair length.

4.    Effective July 18, 1994, inmate grooming is governed by Department of Correction Administrative Directive ("DC-ADM") 807.  A true and correct copy of DC-ADM 807 is attached here as Exhibit 1.

5.    On July 22, 1997, DC-ADM 807 was amended to include DC-ADM 807-3 which governs haircut exemptions on the basis of religious conviction.  A true and correct copy of DC-ADM 807-3 is attached here as Exhibit 2.

6.    DC-ADM 807 was amended to provide a process by which those inmates with sincerely held religious beliefs could seek an exemption to the hair grooming policy for legitimate religious reasons.

7.    It was and is the Department's policy upon receiving an inmate's request for an 807 exemption to require the inmate to provide in addition to that request a letter or other certification from his outside faith group which verifies that he was known by the head of his religious faith while on the street and had a history of participating in his claimed religion before his incarceration.

8.    The requirement in DC-ADM 807 that inmates provide evidence of outside religious participation was included to aid in the differentiation by prison administrators of inmates' *bona fide* religious claims from those put forth by inmates for reasons other than religious beliefs.

9.    I am familiar with plaintiff William Branch.

2

10.    I do not have a specific recollection of having spoken to Mr. Branch about a haircut exemption on any particular Sunday in September of 2000. However, I am very busy when I am at the prison on Sundays and routinely tell prisoners who approach me concerning haircut exemptions on Sundays that I prefer not to discuss business on Sundays.

11.    I recall that when Mr. Branch discussed his request for a haircut exemption he claimed to be a Nazarite, which is a faith group which has no requirement that its followers not cut their hair.  Mr. Branch's application for a haircut exemption based upon his beliefs as a Nazarite was denied because the requirement that he not cut his hair has no basis in the Bible.  It is based upon his own "private" interpretation of the Bible.

12.    Mr. Branch has never provided a letter, certification or any documentation from any faith group which verifies that not cutting his hair is a required precept of the faith.

13.    Mr. Branch's application for a hair cut exemption was not denied to persecute or intimidate him.  Nor was it denied to punish him for filing lawsuits and grievances.

14.    Mr. Branch's application for a hair cut exemption was denied because he did not satisfy the requirements of DC-ADM 807.

3

Date: 12/31/03 _____     _____ CHAPLAIN WILLIAM GAGAS

4

**Appendix H**

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **William Branch** | : |
| **Plaintiff** | : |
| | :     **No. 1:CV 00-1728** |
| **v.** | : |
| | :     **(Judge Rambo)** |
| **CO Russian, et al.** | : |
| **Defendants** | : |
| | : |

## DECLARATION OF WAYNE GAVIN

I, Wayne Gavin, do hereby state under penalty of perjury that the following is true and correct and based upon my person knowledge:

1.     I am and was at all times relevant to this lawsuit employed by the Department of Corrections at the State Correctional Institution at Waymart ("SCI-Waymart") as a Captain.

2.     In that capacity, I am required to be and am familiar with the Department's policies and directives governing the grooming of prisoners. The term "grooming" encompasses the cutting of hair on the face and head among other things. The grooming of prisoners is governed by Department of Corrections Administrative Directive ("DC-ADM") 807. A true and correct copy of DC-ADM 807 is attached here as Exhibit 1.

3.     Prisoners at SCI-Waymart are provided notice of DC-ADM 807 as well as all of the other directives governing their conduct during their

well as all of the other directives governing their conduct during their

incarceration in the Inmate Handbook which is given to them upon their arrival. Moreover, copies of the Inmate Handbook are available on each cell block and in the prison law library.

4.    DC-ADM 807 VI. A. provides that "hair that does not fall below the top of the collar (Afro styles no longer than 4 inches) shall be permitted".

5.    DC-ADM 807 VI. D. provides that prisoners who refuse to comply with the directive's hair length provisions are subject to disciplinary action.

6.    To obtain an exemption from the hair cut directive on religious grounds, a prisoner must submit a written request to the Facility Chaplaincy Director and receive written approval.

7.    When I observe a prisoner whose hair is in violation of DC-ADM 807, I generally direct him to get a haircut and advise that failure to do so will result in the issuance of a misconduct.  Because prisoners have knowledge of the grooming directive by way of their inmate handbooks, I do not afford them the opportunity to disregard my direction and then request a religious exemption.

8.    If I directed William Branch to cut his hair or face disciplinary action for failing to do so, it was because he was in violation of DC-ADM 807 and because he had not obtained a religious exemption excusing him from the hair cutting requirements of the directive.

2

9.    Enforcement of DC-ADM 807 serves the goals of safety, security and hygiene. Keeping the hair at appropriate lengths prevents prisoners from hiding contraband in their hair, changing their appearance, and spreading disease.

10.    I have never interfered with Branch's efforts to apply for or receive a religious exemption from the hair cutting requirements of DC-ADM 807.

11.    I have never directed Branch to cut his hair to harass him, intimidate him, interfere with the practice of his religion or to punish him for filing lawsuits or grievances.

12.    I have never subjected Branch to disciplinary action to harass him, intimidate him, interfere with the practice of his  religion or to punish him for filing lawsuits or grievances.

13.    I have never conspired with anyone to harass Branch, intimidate him, interfere with the practice of his religion or to punish him for filing lawsuits or grievances.

14.    I apply DC-ADM 807 uniformly to all SCI-Waymart prisoners

Date:  1-2-04                                    Wayne J Gavin

                                        WAYNE GAVIN

3



**POLICY STATEMENT**
**Commonwealth of Pennsylvania · Department of Corrections**

| Policy Subject:<br>**Inmate Hygiene and Grooming** | Policy Number:<br>**DC-ADM 807** |
|---|---|
| **Date of Issue:**<br>December 16, 1997 | Authority: | **Effective Date:**<br>December 16, 1997 |

## I. AUTHORITY

The Authority of the Secretary of Corrections to direct the operations of the Department of Corrections is established by Sections 201, 206, 506, and 901.B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. PURPOSE

It is the purpose of this policy to establish clear, consistently applied and enforced guidelines for inmate grooming in accordance with security, health, and personal hygiene needs of both the inmate populations and the institution.

## III. APPLICABILITY

This policy is applicable to all inmates in all Department of Corrections facilities and Community Corrections Centers with the sole exception of the Quehanna Boot Camp.

## IV. DEFINITIONS:

A. Community Corrections Center - all Department of Corrections Community Corrections Centers as well as all contract Community Corrections facilities.

B. Hairpieces - artificial hair including wigs, toupees, hair weaves or other artificial hair devices.

## V. POLICY

It is the policy of the Department of Corrections to operate institutions that provide a safe environment for inmates and staff. The hygiene and grooming directive plays an important role in maintaining institution security as well as promoting a clean, healthy environment for inmates and staff.

## VI. PROCEDURES

A. <u>Male Hair Styles</u>

1. Hair that does not fall below the top of the collar in length (afro styles no longer than 4 inches) shall be permitted. Hair must be kept neat and clean.

inches) shall be permitted. Hair must be kept neat and clean.

DC-ADM 807

2. A beard or goatee no longer than 3 inches; a mustache, and sideburns shall be permitted provided they are kept neat and clean.

3. Dyeing, coloring or tinting of hair is prohibited.

B. Female Hair Styles

1. Hair styles will be permitted provided they are kept neat and clean.

2. Dyeing, coloring, or tinting of hair is permitted only as provided by the certified training program for cosmetology in the institution beauty shop.

C. Grooming Services

1. Inmates are not permitted to cut or groom the hair or beard of another inmate except as part of the institution barber, cosmetology or beauty shop programs.

2. Hair, beards, and mustaches shall be trimmed to maintain hygiene and safety standards and to meet requirements of work, especially around mechanical equipment and food. On such assignments, inmates may be required to wear appropriate covering such as hats or hair nets.

3. At institutions housing certified barbering/cosmetology programs, there may be occasions where special grooming procedures require the use of "models". In such instances, the instructor may request authorization from the Superintendent for such procedures to be performed on inmate volunteers. The Superintendent shall make a determination and advise the instructor of the decision.

4. Hairpieces may be permitted when it is necessary to present a normal appearance due to inability to grow hair as a result of an accident, injury, or disease as certified by the institution physician.

D. Security

1. Inmates who refuse to comply with the provisions of this directive are subject to disciplinary action pursuant to DC-ADM 801.

2. All hairstyles must be able to be searched by institution staff utilizing institutional security equipment or pat searches.

3. Any grooming activity which apparently changes the appearance of the inmate must be reported to the Records Office for immediate review and possible issue of new identification photo.

E. Exceptions

Exceptions to the provisions of this directive may be granted for legitimate religious reasons on a case by case basis. The following procedures are to be followed to request/obtain a religious exemption:

1. The inmate must submit a written request for a haircut exemption to the Facility Chaplaincy Program Director (F.C.P.D.)

2. The request must indicate the religious convictions upon which the exemption is based.

3. All inmates who request a haircut exemption on the basis of religious conviction must supply something in writing confirming the inmate's participation in the particular religion. This can be a certified letter from the religious leader of that particular faith group, or in the case of Native Americans, a certificate of participation from a recognized Chief or tribal leader. The letter or certificate must indicate that the inmate in question has demonstrated a history of adhering to the tenets of particular faith group.

4. The F.C.P.D., after speaking with the inmate, determines the validity of the request.

4. The F.C.P.D., after speaking with the inmate, determines the validity of the request.

DC-ADM 807

5.  The F.C.P.D. shall notify the Superintendent or designee of the determination and recommendation. The Superintendent or designee shall issue the approval/disapproval.

6.  The Superintendent's decision is sent to the F.C.P.D. who, in turn, notifies the appropriate staff and inmate. Notification is also placed in the inmate's central file, DC-15.

7.  In cases where the F.C.P.D. cannot make an appropriate determination, the Facility Chaplaincy Program Director must submit all written information to the Administrator of Religion and Family Services for review and recommendation.

8.  The exemption will be lifted if there is a change in the status of the inmate, e.g. converts to another religion which does not require an exemption to hair length.

F.  Personal Hygiene

Inmates are expected to maintain acceptable personal hygiene. Inmates who refuse to maintain personal cleanliness may be subject to a misconduct.

## VII.  SUSPENSION DURING EMERGENCY

In an emergency situation or extended disruption of normal institutional operations, any provision or section of this policy may be suspended by the Secretary or his/her designee for a specified period of time.

## VIII.  RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose of the policies of the Department of Corrections.

## IX.  SUPERSEDED POLICY AND CROSS REFERENCE

This policy supersedes the previous policy on this subject, by former Secretary Joseph D. Lehman, effective July 18, 1995 and the policy bulletins DC-ADM 807-1 by former Executive Deputy Secretary Lawrence J. Reid issued November 18, 1994, DC-ADM 807-2 by Executive Deputy Secretary Raymond E. Clymer, Jr. issued August 15, 1995 and DC-ADM 807-3 by Secretary Martin F. Horn issued July 22, 1997.

A.  Administrative Manuals Cross Reference(s);

B.  ACA Cross Reference(s): 3-4270, 3-4325, 3-4459



**Bulletin**
**Commonwealth of Pennsylvania• Department of Corrections**

| To: | Executive Staff<br>Superintendents<br>Regional Directors | Policy Subject:<br>Inmate Grooming and Hygiene |
| --- | --- | --- |

| Policy Number: | DC-ADM 807-3 |
| --- | --- |
| Policy Issue Date: | July 18, 1994 |

| Date of Issue:<br>July 22, 1997 | Authority: | Effective Date:<br>July 22, 1997 |
| --- | --- | --- |

The following addition to the DC-ADM 807, Inmate Grooming and Hygiene policy is being made regarding an inmate request for a "haircut exemption on the basis of religious conviction".

All inmates who request a haircut exemption on the basis of religious conviction must supply something in writing confirming the inmate's participation in the particular religion. This can be a certified letter from the religious leader of that particular faith group, or in the case of Native Americans, a certificate of participation from a recognized Chief or tribal leader. The letter or certificate must indicate that the inmate in question has demonstrated a history adhering to the tenets of the particular faith group.

**Appendix I**

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

William Branch                    :
      Plaintiff            :
                    :    **No. 1:CV 00-1728**
  v.                              :
                    :    **(Judge Rambo)**
CO Russian, et al.                :
      Defendants           :
                    :

## DECLARATION OF MARTIN WALSH

I, Martin Walsh, do hereby state under penalty of perjury, that the following is true and correct and based upon my personal knowledge:

1.    I am and was for all time relevant to this lawsuit employed by the Department of Corrections at the State Correctional Institution at Waymart ("SCI-Waymart") as the Principal.

2.    In this capacity, I am familiar with the rules, directives and policies governing the administration of education at SCI-Waymart.

3.    Under educational policies in effect at SCI-Waymart, a prisoner who is participating in a school program may request and be excused from attending class for certain events, including medical appointments, hair cuts and certain religious events.

4.    For a religious event to be approved as an excused absence from school, it must be considered a required part of a religious service.

school, it must be considered a required part of a religious service.

5.      Choir practice has never been viewed as a required part of a religious service and is not, therefore, an event which can be approved as an excused absence.  Attendance at choir practice is wholly voluntary on the part of its participants.

6.      Nevertheless, a prisoner attending school is allowed three unexcused absences from class per semester.  A prisoner enrolled in a school program who receives a fourth unexcused absence is dropped from the class.

7.      In 2001, Mr. Branch was enrolled in night school at SCI-Waymart and was taught by Ms. Wilbur.

8.      Night school was held on two evenings each week.

9.      Requests by Mr. Branch or other prisoners for excused absences to attend choir practices held during an evening when night school was held were not approved.

10.      Mr. Branch was not treated differently than any other similarly situated prisoner in the manner in which his requests for excused absences from class were considered.

11.      Ms. Wilbur acted in a manner which is consistent with educational policies in refusing to approve Mr. Branch's request for excused absences from class to attend choir practice.

2

12.   Mr. Branch's requests for excused absences from class for choir practice were not denied to harass him, to force him to withdraw any lawsuits he may have had or for any other reason.

13.   I have never conspired with Ms. Wilbur or with anyone else to punish Mr. Branch for filing lawsuits or grievances.

Dated:   _12- 30-03_

_Martin Walsh_
**MARTIN WALSH**

3

**Appendix J**

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

William Branch                              :
       Plaintiff                       :
                           :   **No. 1:CV 00-1728**
   v.                                    :
                           :   **(Judge Rambo)**
CO Russian, et al.                          :
       Defendants                      :
                           :

## DECLARATION OF CHRISTINA WILBUR

I, Christina Wilbur, do hereby state under penalty of perjury that the following is true and correct and based upon my personal knowledge:

1.    I am and was for all times relevant to this lawsuit employed by the Department of Corrections at the State Correctional Institution at Waymart ("SCI-Waymart") as a teacher.

2.    In 2001, William Branch was one the students in my evening English classes held two times a week.

3.    I did not approve or recommend the approval of requests for excused absences made by prisoners attending my evening class to enable them to attend choir practice because choir practice is a voluntary activity and is not included among the required religious events for which excused absences may properly be approved.

4.    In addition, because night school is held only two nights each week,

approving a request for an excused absence from a prisoner attending night school

to attend choir practice on one of those nights would be counterproductive because

it would have the effect of reducing a prisoner's class time by half.

  5.  The decisions I made concerning Mr. Branch's requests for excused

absences were not motivated by any desire on my part to harass or punish him for

filing lawsuits or grievances or for any other reason.

  6.  I did not apply the prison's policy concerning excused absences to

Mr. Branch to single him out or to treat him differently than I treated similarly

situated prisoners.

  7.  I have never conspired with anyone to deprive Mr. Branch of rights

protected by state or federal law.


Date: 12/30/03         **CHRISTINA WILBUR**

2

**Appendix K**

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

William Branch          :
      Plaintiff      :
                 :     **No. 1:CV 00-1728**
     v.              :
                 :     **(Judge Rambo)**
CO Russian, et al.    :
      Defendants   :
                 :

## <u>DECLARATION OF CAROL SURACE</u>

I, Carol Surace, do hereby state under penalty of perjury that the following is true and correct and based upon my personal knowledge:

1.    I am and was at all times relevant to this lawsuit employed by the Department of Corrections at the State Correctional Institution at Waymart ("SCI-Waymart") as a Correctional Industry Supervisor in the prison's Garment Plant.

2.    I supervised William Branch when he worked in the Garment Plant.

3.    Branch last worked in the Garment Plant in 1997.

4.    While Branch was employed in the Garment Plant, he missed work on several occasions without excuse.

5.    On October 10, 1997, I wrote Branch up for failing to report for work and unexcused absences.

6.    Branch was reported to have missed work on that date because he was sleeping.

sleeping.

7.    Branch had not asked me for time off from his job to prepare legal briefs for Civil Action Number 95-cv-00751 and I had not granted him time off.

8.    Branch was afforded a hearing on the charges I made against him and was found guilty of those charges on October 15, 1997.  He was removed from his job in the Garment Plant as a sanction.

9.    I did not write charges against Branch to force him to withdraw his lawsuits, to deny him access to the courts or for any other improper reason.

10.    I wrote Branch up because he failed several times to come to work after being warned that his failure could result in the loss of his job.


Date: _1 - 2 - 04_          _Carol Surace_
                            **CAROL SURACE**

2

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

William Branch                    :
      Plaintiff               :
                              :        No. 1:CV 00-1728
   v.                          :
                              :
CO Russian, et al.                :        (Judge Conner)
      Defendants              :
                              :        ELECTRONICALLY FILED

## CERTIFICATE OF SERVICE

I, **GWENDOLYN T. MOSLEY,** Senior Deputy Attorney General

for the Commonwealth of Pennsylvania, Office of Attorney General, hereby

certify that on **December 31, 2003**, I caused to be served a true and correct copy

of the foregoing document **Documents in Support of Defendants' Motion for**

**Summary Judgment,** by depositing it in the United States mail, first-class

postage prepaid to the following:

**William Branch, CF-3756**
**SCI-Waymart**
**P.O. Box 256**
**Waymart, PA  18472**


                      **s/GWENDOLYN T. MOSLEY**
                      **GWENDOLYN T. MOSLEY**
                      **Senior Deputy Attorney General**