**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM R. BRANCH,** | : | **CIVIL ACTION NO. 1:00-CV-1728** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **MR. RUSSIAN, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Presently before the court is a motion (Doc. 129) by defendants, officials and employees of the Pennsylvania Department of Corrections, for summary judgment in their favor on the claims under 42 U.S.C. § 1983 of plaintiff, William R. Branch ("Branch"), a prisoner of the state corrections institution at Waymart, Pennsylvania ("SCI-Waymart"). The motion will be granted.

## I.    <u>Statement of Facts</u>

The claims asserted by Branch implicate a series of incidents involving numerous individuals over the course of several years. For this reason, the following discussion will be organized by event rather than chronology. In accordance with the applicable standard of review, the court will present the facts substantially as gleaned from plaintiff's evidence, primarily his own declaration

(Doc. 145) filed in response to the motion for summary judgment.[1]  See supra

Part II.

## Kitchen Employment and Trash

In February 2000, Branch was employed in the kitchen of SCI-Waymart,

under the supervision of defendant Julie Suchy ("Suchy"), a food service

instructor.  Suchy directed Branch to take the garbage out of the kitchen, and

Branch agreed to do so.  However, she later observed another inmate completing

the task.  She issued a misconduct to Branch for failing to obey orders and for lying

to staff.  At a subsequent disciplinary hearing, Branch was found in violation of

prison regulations and removed from his position in the kitchen.  (Doc. 145 at 1;

Doc. 130, App. A).

Branch asserts that Suchy issued the misconduct in retaliation for Branch's

filing of a lawsuit, Branch v. Fabricatore, No. 95-CV-0751 (M.D. Pa. Nov. 5, 1996),

and to undermine his application for parole.  The lawsuit cited by Branch was

dismissed by the Honorable Sylvia H. Rambo on November 5, 1996, in a decision

affirmed by the Court of Appeals for the Third Circuit in March 1998.  Branch does

---

[1] Defendants urge the court to reject the statements in the declaration
because "Branch simply repeat[s] the allegations in his complaint."  (Doc. 179 at 7).
While a party cannot simply rest upon the pleadings to oppose a motion for
summary judgment, see Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D.
Pa. 2004), nothing in the Federal Rules of Civil Procedure precludes a party from
reiterating the allegations of the complaint in a sworn declaration in opposition to
summary judgment.  Statements in such affidavits, assuming that they are based
on personal knowledge, are part of the summary judgment record, see FED. R. CIV.
P. 56(e), and the court has relied substantially on Branch's affidavit in constructing
the following statement of facts.

not identify the date of his parole application and does not explain whether or how his parole opportunities were limited by the misconduct. (Doc. 145 at 1).

## Cabinet Inspection

Inmates' cells at SCI-Waymart were subject to periodic "security checks" by guards. These "checks" included inspections of appliances and cell components to ensure the area's safety. (Doc. 145 at 2-4; Doc. 130, App. B; see also Doc. 179, App. L).

Sometime in mid-2000, defendant Richard Russian ("Russian"), a corrections officer at the institution, performed a security check of Branch's cell. This check was purportedly more intrusive than those conducted of other inmates' cells. Branch's possessions were allegedly strewn about his cell, and Russian "told everyone within ear[shot] what was in there." When Russian attempted to inspect the interior of a cabinet in the cell, Branch told the officer that the latter did not have the authority to do so. Russian disagreed, and continued with his inspection of the cabinet. Apparently nothing improper was discovered. (Doc. 145 at 1; Doc. 130, App. B).

Soon thereafter, Branch file an official grievance, asserting that the check violated prison policies. The grievance was referred to defendant Milton Friedman ("Friedman"), the manager of the unit where Branch was held. During his investigation of the complaint, Friedman spoke with Branch. When the latter became "argumentative," Friedman warned that, "if [Branch] could not control himself," he would be moved from his current room to an "open dormitory" in the

prison.  Branch apparently relented, and no disciplinary action was taken.

Friedman later determined that Russian's actions comported with official policy.

(Doc. 145 at 4-7; Doc. 130, App. C).

Branch asserts that these events reflect a conspiracy between Russian and

Friedman to retaliate against Branch for his filing of a lawsuit against staff

members.  (Doc. 145 at 2-7).  The lawsuit, <u>Branch v. Horn</u>, No. 1:99-CV-0670 (M.D.

Pa. May 18, 1999) (Rambo, J.), was dismissed in May 1999, and the Court of Appeals

for the Third Circuit recently affirmed the decision, <u>Branch v. Horn</u>, No. 99-3507 (3d

Cir. Jan. 11, 2005).

## **Calorie Counting**

Health administration officials at SCI-Waymart, including defendant Neil

Heffernan ("Heffernan"),[2] treated Branch for diabetes and hypertension during his

incarceration.  As part of this treatment, Branch was designated to receive a daily

intake of 2000 calories.  In July 2000, in response to his request, Branch's intake was

increased to 2500.  Soon thereafter, it was reduced back to 2000 calories based on

changes in his blood sugar level.  Branch immediately complained, and his intake

---

[2] The docket reflects that the claims against Heffernan were dismissed in
2001 (Docs. 46, 57), before this case was reassigned from the Honorable Sylvia H.
Rambo to the undersigned (Doc. 97).  Nonetheless, because Heffernan joined in the
motion for summary judgment, the court will treat him as a party for purposes of
this discussion.  <u>Cf.</u> FED. R. CIV. P. 15(b) ("When issues not raised by the pleadings
are tried by express or implied consent of the parties, they shall be treated in all
respects as if they had been raised in the pleadings.").

was increased again to 2500 calories in early August.  (Doc. 145 at 7; Doc. 130, App. D).

Branch states that he does not "feel [that] Heffernan did anything wrong" and named him in the complaint merely because his name appeared on the notification of the caloric intake reduction.  Branch suggests that Heffernan did not order this change, but that other, unknown members of the staff did so under his name in order to retaliate against Branch.  (Doc. 145 at 7).

### Legal Library and Papers

While he was confined in a restricted housing area of the institution, supervised by defendant Timothy Welling ("Welling"),[3] Branch was not allowed to accompany other inmates in the law library.  This was purportedly contrary to prison regulations providing that two inmates may use the facility at the same time.  As a result, Branch was "not allowed the help" of other inmates in drafting a motion for appointment of counsel in a criminal appeal pending in the state courts. The motion was denied.  (Doc. 145 at 8).  It is unclear whether the appeal was successful.

During the same period, and while Branch was still housed in the restricted area, certain unidentified "legal papers" were withheld from him.  They were returned soon after (within approximately thirty days), but Branch wrote several grievances and requests to prison officials complaining of these actions.  Upon receiving one of these requests, Welling "balled [it] up" and "threaten[ed]" Branch

---

[3] Identified incorrectly as "Wellington" in plaintiff's submissions.  (See Doc. 130, App. E).

to "stop reporting his staff to the [superintendent] or [Welling] would stop being nice." It appears that the request was nevertheless forwarded to and received by the superintendent's office. (Doc. 145 at 8-9; <u>see also</u> Doc. 130, App. E).

Branch argues that the withholding of his legal papers and Welling's threat demonstrate retaliation by staff, presumably for the filing of lawsuits and grievances. He alleges that these actions, which occurred in 2000, represent a continuing "pattern of past violations" that started in 1996. (Doc. 145 at 8-10).

### Bunk Transfers

Sometime during 2000, Branch became dissatisfied with his bunk assignment because adjacent inmates smoked[4] and shared different religious views from his own. An initial request for transfer was denied by defendant Barry Karwowski ("Karwowski"), a corrections officer at the institution. Branch then spoke with defendant Elaine Martin ("Martin"), a unit manager working under Karwowski. Branch was later moved to the top bunk in another section of the institution. It is unclear whether the move was finally authorized by Martin or Karwowski.[5] (Doc. 145 at 10-15; Doc. 130, App. F).

The top bunk to which Branch was moved was insufficient to meet Branch's medical needs. He had previously been placed on "bottom bunk status" based on

---

[4] None of the exhibits or affidavits submitted by the parties apparently shows that Branch was housed in a smoking area. Nonetheless, because defendants seem to concede the veracity of the complaint's allegations in this regard (Doc. 179 at 8-9), the court will accept them as true.

[5] Branch also states, without further elaboration, that "Russian delayed moving [him] [h]oping that [Branch] would be beat up." (Doc. 145 at 10-15).

problems with his knees.  The nature of these problems is not explained, but Branch asserts that, by sanctioning his move to a top bunk, Karwowski and others were "deliberately indifferent" to these problems.  He soon complained to the medical department, and was moved to a bottom bunk in another area.  (Doc. 145 at 10-15; Doc. 130, App. F).

Branch asserts that the new area was "cramped" and that his bunk was adjacent to another inmate with violent tendencies.  He requested another move, but Karwowski refused.  Branch remained in the bunk for approximately one year, but apparently suffered no assault or other ill-effects from the assignment.  (Doc. 145 at 10-15; Doc. 130, App. F).

While in this area, Branch was issued a misconduct by Karwowski for failing to "sit up" for a head count of inmates.  Branch implies (but does not clearly state) that he was sitting up at the time of the count, and that the misconduct was false.  Branch was later found guilty of the misconduct after a disciplinary hearing, in which Friedman participated as a member of the reviewing panel.  (Doc. 145 at 10-15; Doc. 130, App. F).

Branch asserts that, in addition to these actions, Karwowski and other staff members used foul language in his presence and issued several baseless misconducts.  They allegedly threatened Branch with transfer from SCI-Waymart

if he did not "stop writing up staff and filing [lawsuits]."[6]  Branch identifies this as

further evidence of a conspiracy to retaliate against him for the filing of grievances

and lawsuits. [7]  (Doc. 145 at 10-15).

## Grooming Regulations

Sometime in 2000, defendant Wayne Gavin ("Gavin"), a captain at SCI-

Waymart, directed Branch to report to prison grooming services to have his hair

cut in accordance with prison regulation 807.  This rule prohibits inmate hair styles

that "fall below the top of the collar in length."  At the time, Branch's hair was

longer than this, and was kept in a braid and "rolled up under [his] chin."  (Doc.

145 at 16-25; Doc. 130, Apps. G, H).

On the day before Branch was to report to prison grooming services, Branch

contacted defendant William A. Gagas ("Gagas"), employed by SCI-Waymart as a

chaplain, to request an exemption from the policy.  Prison regulation 807 provides

a limited exemption from the grooming requirements for "legitimate religious

reasons" if the inmate submits "something in writing confirming the inmate's

---

[6] Branch also claims that, by imposing scheduling restrictions on attendance at religious studies classes, Karwowski and defendant Bikos, another corrections officer, "attacked [Branch's] religious freedom."  (Doc. 145 at 14-15).  He does not explain the nature of these restrictions further.

[7] Branch reports that another officer at SCI-Waymart divulged that Karwowski did not "like" Branch.  (Doc. 145 at 13).  The reason for this antipathy was apparently not disclosed to Branch.

participation in the particular religion."[8]  Branch did not submit any such letter,
but claimed to be a "Nazarite."  Although Nazarites are an established faith group,
they do not generally mandate that followers refrain from cutting their hair.
Branch recognized this, but argued that he interpreted the Bible to mandate long
hair.  Gagas denied the exemption because Branch had not complied with the
written documentation condition of regulation 807, and Branch was required by
Gavin and defendant Burke, another official at the institution, to cut his hair.
(Doc. 145 at 16-25; Doc. 130, Apps. G, H).

Around this time, Gagas removed Branch from the "call out" for choir
practice.  Nothing in the record defines the phrase "call out," but it apparently
refers to a list of inmates who are permitted to attend the practice of a choir
organized by Gagas.  Branch suggests that he was removed from this list when he
was placed in restricted housing at the institution.  Nevertheless, Branch claims
that his removal from the "call out" list was taken in retaliation for his initiation of
grievances and lawsuits.  (Doc. 145 at 16-25; <u>see also</u> Doc. 130, App. G).

<u>**Choir Practice and Educational Resources**</u>

Branch participated in choir practice on Wednesday evening, during the
same time that English classes for inmates were scheduled.  He asked defendant
Martin Walsh ("Walsh"), administrator of educational programs at the institution,

---

[8] The policy suggests—but does not require—that this written
documentation be a letter from a "religious leader of th[e] particular faith group"
demonstrating the inmate's "history of adhering to the tenets" of that group.  (Doc.
130, App. H).

to be excused from the Wednesday class. (Classes were held four nights of the week.) Walsh denied the request pursuant to prison regulations, which provide that choir practice is not part of a "religious service" for which an excused absence is allowed. The class instructor, defendant Christina Wilbur ("Wilbur"), also denied Branch's request on the same grounds. Branch continued to attend choir practice, and, after his fourth absence from the class, he was dropped from the English program according to prison policy. (Doc. 145 at 25-29; see also Doc. 130, Apps. I, J).

Branch asserts that other inmates were allowed to attend choir practice, but does not indicate whether those inmates were also dropped from class for absenteeism. He alleges that the actions against him reflect religious bias and retaliation for his filing of lawsuits. He also claims, without further explanation, that Walsh hindered his access to the law library.[9]  (Doc. 145 at 25-29).

### Factory Work

In 1997, Branch was employed in the prison garment plant, supervised by defendant Carol Surace ("Surace"). In order to meet certain deadlines in his pending cases, it was necessary for Branch to miss work on several occasions. He

---

[9] Branch also asserts that other individuals limited his library access and otherwise took various actions against him. (Doc. 145 at 27-29). These individuals are not named in the complaint (Doc. 22), however, and apparently have no relation to Branch's claims other than as part of the grand cabal allegedly operating in the prison bureaucracy.

had not been excused from his duties by Surace, and several misconducts were issued against him.  (Doc. 145 at 29-32; see also Doc. 130, App. K).

He was working in the plant on the morning of October 10, 1997.  Surace had been "yell[ing]" at him and his "blood pressure went sky high."  During a break (presumably for lunch), Branch returned to his cell, took an aspirin, and fell asleep. He failed to report back to work when the break ended and Surace issued him a misconduct.  As a further disciplinary measure, Branch was removed from his position.  (Doc. 145 at 29-32; see also Doc. 130, App. K).

Branch asserts that the misconducts were issued, and that he was removed from his job, in retaliation for the filing of grievances and lawsuits and to force him to withdraw his pending lawsuits.  (Doc. 145 at 29-32).

### Other Defendants

The remaining individuals named in the complaint played apparently more minor roles in the alleged conspiracy against Branch.  Defendants Ronald Richards, Joseph Scalzo, Martin Horn, Kim Griffiths, David Gorman, and Emanuel Patterson hold various positions within SCI-Waymart and the Pennsylvania Department of Corrections.  They are alleged to have taken various punitive acts against Branch and to have supported, or failed to stop, the retaliatory filing of misconducts against him.  (Doc. 145 at 33-39).  Other individuals, including Christopher Jones and Raymond Colleran, both officials of SCI-Waymart, are also alleged to have supported the conspiracy but are not named as parties.  (See Doc. 22).  The additional defendants listed in the docket in this case—Kyler, McAndrew,

Sherman, Beard, Rollison, Freethy, James, Bitner, and O'Hara—are not asserted to have participated in the incidents at issue.

### Complaint

Branch filed his complaint in the case *sub judice* on September 28, 2000. (Doc. 1). In January 2004, defendants filed the instant motion for summary judgment, supported by several affidavits from individuals named in the complaint. (Docs. 129, 130). The only evidence Branch produced in opposition was his own declaration. (Doc. 145). He later requested and was permitted to conduct additional discovery for the purpose of opposing the motion. He submitted several additional exhibits (Doc. 178, Attach. 1) and another declaration (Doc. 201), which repeated his assertions of retaliation by prison officials.

## II.    Standard of Review

"Summary judgment serves as a minimal but important hurdle for litigants to overcome before presenting a claim to a jury." Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 314 (M.D. Pa. 2004). Faced with such a motion, the adverse party must produce affirmative evidence, beyond the disputed allegations of the pleadings, in support of the claim. FED. R. CIV. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Corneal v. Jackson Township, 313 F. Supp. 2d 457, 464 (M.D. Pa. 2003), aff'd, 94 Fed. Appx. 76 (3d Cir. 2004). "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001)

(quoting <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460-61 (3d Cir. 1989)).

Only if this burden is met can the cause of action proceed.  <u>Anderson v. Liberty

Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see</u> FED. R. CIV. P. 56(c), (e).

## III.    <u>Discussion</u>

Section 1983 of Title 42 of the United States Code offers private citizens a

cause of action for violations of federal law by state officials.  <u>See</u> 42 U.S.C. § 1983.

The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity,
> or other proper proceeding for redress . . . .

<u>Id.</u>; <u>see also</u> <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 284-85 (2002); <u>Kneipp v. Tedder</u>, 95

F.3d 1199, 1204 (3d Cir. 1996).  To establish a civil rights claim, the plaintiff must

show a "deprivation" of a constitutional or statutory right by a person "acting

under color of state law."[10] <u>Id.</u> (quoting <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137,

1141 (3d Cir. 1995)).

---

[10] Defendants apparently do not dispute that, during the alleged incidents,
they were "acting under color of state law."

Branch raises a variety of claims under the First, Eighth, and Fourteenth Amendments to the United States Constitution.[11]  They will be addressed *seriatim*.

### A.   **First Amendment**

The First Amendment offers protection for a wide variety of expressive activities, including speech, exercise of religion, and access to the courts.[12]  See U.S. CONST. amend I.  These rights are lessened—but not extinguished—in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  See Turner v. Safley, 482 U.S. 78, 89 (1987).  With this caveat in mind, the court will analyze the several claims raised by Branch.        **1.   Retaliation**

No less than *prior* restraints on speech, *subsequent* retaliation for the expressive activities can infringe upon an individual's rights under the First Amendment.  See Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).  Individuals claiming unconstitutional retaliation must show (1) that they engaged in conduct protected by the First Amendment, (2) that they suffered an "adverse action" by

---

[11] Branch also alleges for the first time in his brief in opposition a violation of the Ex Post Facto Clause of Article I of the Constitution based on the denial of his parole application because he would not admit guilt.  No evidence supports this assertion, and no explanation is provided.  The court will grant summary judgment on this claim without further discussion.  See also Neal v. Shimoda, 131 F.3d 818, 826-27 (9th Cir. 1997) (finding that requirement of admission of guilt did not impose additional punishment in violation of Ex Post Facto Clause) (citing Kansas v. Hendricks, 521 U.S. 346 (1997)).

[12] The right to access the courts also implicates the protections of the Fourteenth Amendment.  See Biereguv. Reno, 59 F.3d 1445, 1452-54 (3d Cir. 1995).  But, because the basis of the right does not alter the constitutional analysis, see id., the court will discuss these issues in the First Amendment context.

government officials, and (3) that impairment of the expressive conduct was "a substantial or motivating factor" for the official action.  Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001); Breiner v. Litwhiler, 245 F. Supp. 2d 614, 632 (M.D. Pa. 2003).

That Branch engaged in protected conduct cannot be reasonably disputed. He filed several lawsuits and a host of grievances.  He told others of his faith and participated in religious observances.  This conduct clearly falls within the ambit of the First Amendment.  See, e.g., Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003).

Less clear is whether the actions purportedly taken in retaliation for this conduct are sufficiently "adverse" to constitute constitutionally cognizable infringements.  Official actions are considered "adverse" only if they would be "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights."  Allah, 229 F.3d at 225 (internal quotations omitted) (quoting Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000)).  While charges of misconduct and physical threats will generally satisfy this standard, see Mitchell, 318 F.3d at 530; Thaddeus-X v. Blatter, 175 F.3d 378, 398-99 (6th Cir. 1999), most of the official actions of which Branch complains do not rise to this level.  Branch's daily caloric intake was reduced, but it does not appear from the record that he suffered any detrimental effects.  His cabinet was searched, but this seems a minimal intrusion in light of the security checks that are performed routinely.  His legal papers were

purportedly withheld, but only briefly.[13]  He was threatened by officers, but only with the warning that they would "stop being nice."  He was transferred to other bunks, but these transfers were at his request.  He was dropped from certain education programs, but was apparently not precluded from participating in others.  None of these actions would likely "deter a person of ordinary firmness from exercising his First Amendment rights."  See Allah, 229 F.3d at 225.[14]

And, assuming *arguendo* that these actions can be considered "adverse," Branch has presented inadequate evidence linking them to protected conduct. Branch relies primarily—if not wholly—on the alleged "temporal proximity" between his protected conduct and the adverse actions.  Temporal proximity may satisfy the causation element of a retaliation claim only when the "timing of the alleged retaliatory action [is] 'unusually suggestive' of retaliatory motive."  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997); see also Rauser, 241 F.3d at 334. Branch made prodigious use of the grievance system during his time of SCI-Waymart.  Dozens of grievances and requests to staff are introduced and referenced in Branch's filings.  Many of these, however, were filed *after* the events at issue and could not serve as a basis for a retaliation claim.  Those that were filed

---

[13] Branch does not suggest that he missed a filing or other court deadline because of the withholding of his papers.  Cf. Lewis v. Casey, 518 U.S. 343, 349-55 (1996).

[14] See also Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001); Stanley v. Litscher, 213 F.3d 340, 343 (7th Cir. 2000); Rouse v. Benson, 193 F.3d 936, 939 (8th Cir. 1999); Thaddeus-X v. Blatter, 175 F.3d 378, 398-99 (6th Cir. 1999); Pratt v. Rowland, 65 F.3d 802, 806-07 (9th Cir. 1995).

prior to or around the time of these incidents are apparently unrelated to the alleged adverse actions. Nothing in the record either expressly or implicitly links the grievances to official actions against Branch.

Nor can Branch successfully argue that his use of the court system motivated official misconduct. The lawsuits Branch alleges as the cause of the retaliation were brought in 1996 and 1999 and dismissed before the year 2000, when most of the events at issue occurred. This substantial delay precludes the court from inferring a causal link based on temporal proximity. See Krouse, 126 F.3d at 503; see also Rauser, 241 F.3d at 334.

Moreover, whether or not these official actions constituted retaliation, the record demonstrates conclusively that, absent any alleged improper motive, defendants would have taken the same actions to further legitimate penological objectives. Once a plaintiff shows that the protected conduct was a substantial or motivating factor in adverse action, prison officials may defeat a claimed constitutional violation by showing that they would have taken the same action absent the conduct. Rauser, 241 F.3d at 333. Affidavits submitted by defendants attest to this fact. Branch would have received misconducts for failing to obey orders and other infractions of prison policies; he would have received a reduced calorie diet in response to changes in his blood sugar level; he would have experienced the same security checks of his cabinet and other areas to ensure prison safety; he would have been transferred to other bunks on his request and to

meet his medical needs; he would have been precluded from participating in various programs and jobs due to absenteeism.  All of these actions were supported by legitimate penological objectives, and all would have been taken regardless of any alleged improper motives.  Branch has failed to present sufficient evidence to support his claims of retaliation for his expressive activities.

### 2.    __Free Exercise of Religion__

Individuals have a constitutionally protected right to follow the religious teachings and practices of their choice.  Employment Div. v. Smith, 494 U.S. 872, 881-83 (1990).  This right may be limited by law of general applicability, restricting both religious and non-religious conduct, but reasonable accommodations for religious observance may be required in certain circumstances.  Id.; see also Wisconsin v. Yoder, 406 U.S. 205, 214-15 (1972).  Particularly in the prison context, where inmates are precluded from engaging in a variety of otherwise permissible activities, officials may be required to provide exemptions from restrictions that place a "substantial burden" on an inmate's adherence to "sincerely held religious beliefs," unless the officials offer compelling reasons for refusing such

accommodation.  See 42 U.S.C. § 2000cc-1(a); see also Smith, 494 U.S. at 884; Turner, 482 U.S. at 89-91.[15]

Branch claims that regulation 807, prescribing grooming requirements, violates his right to free exercise of religion.  However, he has failed to establish the threshold element of such a claim:  a "substantial burden" on the exercise of his religion as a result of enforcement of the regulation.  See 42 U.S.C. § 2000cc-1(a); Turner, 482 U.S. at 89-91; see also Smith, 494 U.S. at 884.  Branch states that long hair is required under a "vow" that he has taken, but he does not explain the nature of this practice under his scriptural interpretation.  Nor does he explain how failure to maintain long hair affects his religious belief.  This is apparently not a case in which long hair inherently symbolizes the spiritual strength of the observant, see Iron Eyes v. Henry, 907 F.2d 810, 816 (8th Cir. 1990); Cole v. Flick, 758 F.2d 124, 129-32 (3d Cir. 1985), in which a religious text generally proscribes the cutting of hair, see Dreibelbis v. Marks, 742 F.2d 792, 793-94 (3d Cir. 1984); Phipps v. Parker, 879 F. Supp. 734, 736 (W.D. Ky. 1995), or in which a tenet of belief

---

[15] The following discussion substantially tracks the provisions of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc-5.  The First Amendment imposes similar, but less strict, standards on prison administrators.  See Williams v. Bitner, 285 F. Supp. 2d 593, 605 (M.D. Pa. 2003).  Thus, the court's conclusion that Branch cannot succeed on the statutory claims obviates the need for a separate constitutional analysis.  It may also be noted that the constitutionality of the RLUIPA is currently under consideration by the Supreme Court.  See Cutter v. Wilkinson, 125 S. Ct. 308 (2004) (mem.) (granting cert.); cf. Williams, 285 F. Supp. 2d at 598-604 (upholding RLUIPA).

affirmatively mandates a certain length of hair, see Green v. Polunsky, 229 F.3d 486, 491 (5th Cir. 2000). Rather, Branch has simply alleged that he is under a "vow" requiring him to keep his hair long without explaining the nature or scope of this practice and the impact of the prison regulation on his overall religious observance. See also DeHart v. Horn, 227 F.3d 47, 52 (3d Cir.2000) ("[C]ourts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question.") (citing O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987); Thornburgh v. Abbott, 490 U.S. 401 (1989)). He has failed to establish a substantial burden on religious exercise.

Moreover, even if Branch could establish a burden on the exercise of his religion, the evidence positively demonstrates that the regulation and written-documentation requirement support compelling governmental interests in the least restrictive manner. See 42 U.S.C. § 2000cc-1(a); see also Smith, 494 U.S. at 884; Turner, 482 U.S. at 89-91. Federal courts, including the Court of Appeals for the Third Circuit, have overwhelmingly upheld restrictions on permissible hair styles as substantially furthering governmental concerns related to safety (e.g., preventing prisoners from keeping contraband in their hair and ensuring that prisoners cannot quickly change their appearance by cutting hair) and hygiene (e.g., facilitating cleaning of skin and limiting the spread of disease). See, e.g., Iron Eyes, 907 F.2d at 816; Cole, 758 F.2d at 129-32; see also Mara R. Schneider, Note,

20

Splitting Hairs:  Why Courts Uphold Prison Grooming Policies and Why They Should Not, 9 MICH. J. RACE & L. 503, 504-13 (2004) (collecting cases).  The same considerations are cited by defendants as support for the regulation *sub judice*, and Branch presents no evidence suggesting that enforcement of the restriction in this case was pretextual or otherwise unequal.

The requirement that inmates submit documentation to substantiate their religious beliefs to obtain an exemption also clearly supports compelling interests.[16]  This condition ensures production of a written record of the inmate's request for an exemption and permits effective review of the inmate's request.  See DeHart, 227 F.3d at 52 & n.3.  It is a minimal burden on inmates that is necessary to permit full consideration of exemption claims.  See Turner, 482 U.S. at 89-91; Mosier v. Maynard, 937 F.2d 1521, 1526-27 (10th Cir. 1991); see also Robins v. Horn, No. 3: 99-CV-1841 (M.D. Pa. Sept. 30, 2001) (upholding same regulation and exemption).  Branch has identified no basis on which a trier of fact could find the

---

[16] A similar burden is imposed on federal inmates seeking religious dietary accommodations.  See 28 C.F.R. § 548.20(b)

regulations unreasonable or improper under federal constitutional or statutory law in light of the compelling interests advanced by defendants.[17]

### 3. Access to Courts

Just as assistance of counsel must be "effective" to satisfy Sixth Amendment standards, access to courts must be "meaningful" to meet First Amendment requirements. Prison officials must provide inmates with the resources necessary to present valid claims to the judiciary. Lewis v. Casey, 518 U.S. 343, 349-55 (1996). These resources most often take the form of a law library or legal assistance, but the Constitution permits prison officials to employ other alternatives that ensure inmates "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." Bounds v. Smith, 430 U.S. 817, 825 (1977), quoted in Lewis, 518 U.S. at 351 (stating that prisoners do not enjoy an "abstract, freestanding right to a law library or legal assistance").

---

[17] The court also finds that defendants are entitled to qualified immunity on the free exercise claims. Officials are entitled to immunity from suit for civil rights violations if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Lower courts have overwhelming upheld the constitutionality of hair-length restrictions, see, e.g., Wilson v. Schillinger, 761 F.2d 921, 925-27 (3d Cir. 1985), including exemptions such as that at issue in this case, see, e.g., Iron Eyes, 907 F.2d at 811 n.3, 816, and recent Supreme Court cases dealing with prison regulations suggest that officials are entitled to substantial deference in their assessment of penological needs, see Turner, 482 U.S. at 89-91. The right asserted by Branch, even if supportable under caselaw, was not clearly established at the time of these events. Defendants are thus entitled to qualified immunity on these claims. See Saucier v. Katz, 533 U.S. 194, 201 (2001).

Branch offers insufficient proof of a violation of his right of access to courts. Although Branch asserts that prison officials did not permit another inmate to assist him,[18] it is clear that SCI-Waymart has a law library to which Branch had access. Branch does not allege that the library was constitutionally insufficient as an alternative means to ensure his access to the court. Although he complains vaguely about limitations on his use of these facilities, nothing in the record suggests that these restrictions rendered him unable to present claims for judicial review.

Branch has also provided insufficient evidence of an "actual injury." To establish a denial of "meaningful" access, an inmate must show an "actual injury" to his legal rights, such as the dismissal of or inability to present an arguably meritorious claim. Lewis, 518 U.S. at 349-55; see also Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997). Branch has alleged that, because he was denied the assistance of another inmate, a motion for appointment of counsel in one of his pending cases was denied.[19] He does not state that this resulted in denial of the appeal or that he had valid claims to present that were not considered. He has thus failed to present

---

[18]But cf. Shaw v. Murphy, 532 U.S. 223, 225-27 (2001) (holding that inmates do not possess a First Amendment right to provide legal assistance to fellow inmates) (citing Turner, 482 U.S. at 89).

[19] Branch also claims, in a single sentence of his declaration, that Karwowski "opened [Branch's] mail and read it." It is unclear whether he asserts this as a denial of access to courts or another type of constitutional violation. Nevertheless, this bald assertion, without elaboration of its motivations or effects, cannot suffice to support a claimed violation of any rights. See, e.g., Turner, 482 U.S. at 89-91.

evidence of cognizable legal harm.  His claims of a violation of his rights to access the courts cannot proceed.

### B.     <u>Eighth Amendment</u>

The Eighth Amendment guarantees that individuals will not be subjected to "cruel and unusual punishments."  U.S. CONST. amend. VIII.  Outside of the criminal sentencing arena, this provision has its broadest application in the prison setting, where it prohibits officials from acting with "deliberate indifference" towards a "substantial risk of serious harm to an inmate."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 828, 832-34 (1994).  A violation of the Eighth Amendment is established when a prison official "knows of and disregards an excessive risk to inmate health or safety."  <u>Id.</u> at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Branch has not alleged any "substantial risk of serious harm" of which prison officials knew and yet disregarded.  He claims that he was placed in a "top bunk," but does not indicate how or whether this impacted his medical condition. He complains that his daily caloric intake was reduced, but does not suggest that this could have or did negatively impact his health.  He asserts that he was placed in cells with violent offenders, but does not state that he was inadequately protected or that harm resulted from his placement.  He alleges that harassment by officials caused his "blood pressure [to go] sky high," but declares that he

recovered quickly after taking "an aspirin and [falling] asleep."  None of the problems advanced by Branch rise to the level of a serious risk to his health.

And, assuming *arguendo* that risks to Branch's health existed, there is no evidence that defendants were deliberately indifferent to them.  To the contrary, the defendants' actions are consistent with due regard to Branch's concerns.  They moved Branch to another bunk when he identified his medical needs.  They increased his caloric intake at his request.  And, for those circumstances in which his complaints went unanswered, he offers no evidence that defendants knew of and disregarded the purported risks to his welfare.  The Eighth Amendment claims cannot proceed.  See Farmer, 511 U.S. at 832-34.

### C.    Fourteenth Amendment

The Fourteenth Amendment to the United States Constitution provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  These clauses guarantee fairness and equality in the treatment of individuals under the custody of the state.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam); Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974).  Branch identifies both the provisions as bases of his claims.

1.    **Due Process Clause**

The Due Process Clause offers procedural and substantive protections against deprivations of "life, liberty, or property." U.S. CONST. amend. XIV, § 1; see Pappas, 331 F. Supp. 2d at 316. The threshold issue of due process analysis is whether the person has been deprived of one of these protected interests. Id.

Branch has failed to meet this prerequisite with respect to many of his claims. He does not have a cognizable liberty or property interest in prison employment, see Bryan v. Werner, 516 F.2d 233, 240 (3d Cir. 1975), participation in educational programs, see Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976), placement in a particular area of the prison, see Sandin v. Conner, 515 U.S. 472, 485 (1995), or privacy of his cell, see Hudson v. Palmer, 468 U.S. 517, 525-26 (1984); Mitchell v. Dupnik, 75 F.3d 517, 522-23 (9th Cir. 1996) (citing Sandin, 515 U.S. at 485). Absent a protected interest, Branch's claims cannot proceed.

And, assuming (once again) *arguendo* that Branch could establish such an interest, he has introduced no evidence suggesting fundamental unfairness in the actions of prison officials. One of Branch's primary concerns appears to be that Friedman, against whom Branch had filed several grievances, was involved in several investigations and disciplinary proceedings. See Wolff, 418 U.S. at 563-67 (requiring an impartial decisionmaker in disciplinary proceedings). However, the filing of a grievance against an official is not, without more, sufficient to raise an indication of unfair bias in other proceedings against the inmate. See id. at 570-71.

26

Branch does not allege other circumstances suggesting bias, and does not explain the nature and scope of Friedman's participation in the disciplinary proceedings. The lack of such evidence precludes success on Branch's claims of procedural due process violations.

No other cognizable due process claims can be gleaned from Branch's submissions. The conduct of which Branch complains was substantially sanctioned by prison regulations and furthered valid penological objectives. Nothing in the record suggests a violation of notice or hearing rights, and nothing suggests an official action that could be reasonably characterized as "conscience-shocking." See United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392, 400 (3d Cir. 2003).[20] Summary judgment on the claims for violations of the Due Process Clause is appropriate.

### 2. Equal Protection Clause

The Equal Protection Clause ensures individuals that they will not be "intentionally treated differently from others similarly situated" in the absence of a "rational basis for the difference in treatment." Olech, 528 U.S. at 564. A single

---

[20] The court will not repeat the analyses of Branch's claimed violations of religious liberty, free speech, and deliberate indifference. See also Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality opinion) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.") (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)) (internal quotation marks omitted).

individual subjected to unequal enforcement of the laws may maintain a civil claim as a "class of one."  Id.

Branch has failed to allege or establish that he was arbitrarily subjected to treatment from others similarly situated.  The actions purportedly taken against Branch, including the check of his cell, are clearly supported by legitimate penological objectives in safety and security.[21]  And, for many of these incidents, Branch offers no evidence that other inmates were treated differently than him. His claims under the Equal Protection Clause cannot proceed.[22]

## IV.  **Conclusion**

The court has conducted an exhaustive (if not exhausting) review of the allegations of the complaint and the evidence presented by Branch.  Even in the best light, his claims are baseless.  Those issues not addressed expressly within this memorandum (due to the sheer volume of extraneous matters introduced in plaintiff's multiple filings) have been considered and rejected by the court as

---

[21] Most of the foregoing discussion, including the analysis of Branch's free exercise claims, is equally applicable here.  See Turner, 482 U.S. at 89-91; see also Robins v. Horn, No. 3: 99-CV-1841 (M.D. Pa. Sept. 30, 2001) (analyzing analogous claims).

[22] Branch appears to raise, in materials submitted with his brief in opposition, a claim of "racial profiling."  (Doc. 178 at 8; see also Doc. 178, Ex. 1). However, other than to state that "all acts are racial" (Doc. 178 at 8), he offers no evidence (or explanation) to support this position.  Summary judgment will be granted as to this claim.

undeserving of further exposition.[23]  The motion for summary judgment will be granted in its entirety.

An appropriate order will issue.


  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:      February 1, 2005

_____

[23] For instance, the claims against Surace (based on incidents in 1997), although substantively deficient, are also clearly barred by the applicable statute of limitations.  See Garvin v. City of Philadelphia, 354 F.3d 215, 220 (3d Cir. 2003) (stating that statute of limitations period for 42 U.S.C. § 1983 actions arising from Pennsylvania occurrences is two years).  And Branch's bald assertions of a general "conspiracy" against him do not present a viable claim.  See Mody v. City of Hoboken, 959 F.2d 461, 466 (3d Cir. 1992) (noting that conspiracy is not an independent cause of action under § 1983 but merely a means to impute liability for independent constitutional violations).

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM R. BRANCH,** | : | **CIVIL ACTION NO. 1:00-CV-1728** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **MR. RUSSIAN, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 1st day of February, 2005, upon consideration of defendants'

motion for summary judgment (Doc. 129), and for the reasons stated in the

accompanying memorandum, it is hereby ORDERED that:

1.    The motion for summary judgment (Doc. 129) is GRANTED.

2.    The Clerk of Court is directed to enter JUDGMENT in favor of defendants and against plaintiff.

3.    The Clerk of Court is directed to CLOSE this case.

4.    Any appeal from this order is DEEMED frivolous and not in good faith.  <u>See</u> 28 U.S.C. § 1915(a)(3).

  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge